**Archangel ANGELO et al., Appellants,**

**v.**

**BACHARACH INSTRUMENT COMPANY, a division of American Bosch Arma Corporation, a New York Corporation.**

**No. 76–1127.**

United States Court of Appeals, Third Circuit.

Argued Jan. 14, 1977.

Decided May 10, 1977.

---

Winn Newman, Ruth Weyand, Washington, D. C., Richard D. Gilardi, Janice I. Gambino, Gilardi & Cooper, Pittsburgh, Pa., for appellants.

H. Woodruff Turner, Aims C. Coney, Jr., Thomas A. Donovan, Kirkpatrick, Lockhart, Johnson & Hutchison, Pittsburgh, Pa., for appellees; David S. Lindau, Holtzmann, Wise & Shepard, New York City, of counsel.

Before ROSENN and HUNTER, Circuit Judges, and COOLAHAN, District Judge.*

## OPINION OF THE COURT

ROSENN, Circuit Judge.

This case was brought under the Equal Pay Act of 1963[1] to eliminate wage differentials allegedly based on sex. The question presented is whether female plaintiffs, employed as Bench Assemblers by the defendant Bacharach Instrument Company ("Bacharach"), carried their burden of proving that for purposes of the Act their work was equal to the work of more highly paid males employed as Heavy Assemblers in the same plant. At the close of the plaintiffs' case, the district court for the Western District of Pennsylvania ruled that there was not sufficient evidence to support an equation of the job categories at issue, and directed a verdict for the defendant. Plaintiffs have appealed from the judgment entered in defendant's favor. We affirm.

### I.

Bacharach, a division of AMBAC Industries, Inc., operates a manufacturing plant near Pittsburgh, Pennsylvania, at which all of the fifty-four plaintiffs are employed. The plant produces such products as diesel automotive diagnostic equipment, instruments for the detection of combustible and toxic gases, and instruments for testing and recording temperature and humidity levels. At the time the instant case was tried, the

---

\* James A. Coolahan, United States District Judge for the District of New Jersey, sitting by designation.

1. 29 U.S.C. § 206(d)(1) (1970) provides:

No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: *Provided,* That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee.

The Equal Pay Act of 1963 was passed as an amendment to the Fair Labor Standards Act of 1938, 29 U.S.C. §§ 201 *et seq.* (1970).

collective bargaining agreement that covered the plant's production and maintenance employees, including the plaintiffs, identified fifty-five job classifications applicable to employees in the bargaining unit. Bacharach and the signatory unions [2] jointly assigned the fifty-five classifications to nine labor grades, and also assigned wage rates to the labor grades. Labor grade 1 was the highest paid, grade 9 the lowest.

Bacharach maintains two separate assembly departments at its Pittsburgh plant, Heavy Assembly and Light Assembly. All of the plaintiffs work in the Light Assembly area as Bench Assemblers; some are classified as Bench Assemblers-B (labor grade 6), while the others are classified as Bench Assemblers-A (labor grade 5). In Light Assembly, Bacharach produces a wide assortment of mechanical and electronic measurement and gas detection instruments. Among the devices manufactured by Bench Assemblers in Light Assembly are instruments that measure air flow, temperature, humidity, electrical current, gas pressure, and the presence or absence of certain gases in mines. Some Bench Assemblers also construct components known as sub-assemblies which are ultimately incorporated into the diesel fuel pump test stands that are built in Heavy Assembly. In addition to these test stands, workers in Heavy Assembly construct two other devices, comparators and methane monitors.

Plaintiffs allege that they are compensated at a rate of pay less than the rate paid to males in Heavy Assembly for the performance of equal work that requires equal skill, effort, and responsibility, and that is performed under similar working conditions. Specifically, the plaintiffs claim that Bench Assemblers-B (labor grade 6) should receive the same rate of pay as Intermediate As-

semblers in Heavy Assembly (labor grade 5), or as Assemblers in Heavy Assembly (labor grade 3), and that Bench Assemblers-A (labor grade 5) should receive the same rate as Assemblers in Heavy Equipment (labor grade 3).[3] The complaint asserts that the difference in pay between the Bench Assemblers and the Heavy Assemblers is based solely on sex.

At the jury trial, the plaintiffs endeavored to equate the work of the Bench Assemblers with the work of the Heavy Assemblers by the testimony of witnesses employed in the two departments. Five female plaintiffs employed as Bench Assemblers-B (labor grade 6) testified that their work consisted of assembling certain instruments in accordance with blueprints and sequence sheets. In the course of doing their jobs, they said, they performed such tasks as cutting, wiring, soldering, drilling, aligning, gluing, reaming (enlarging pre-made holes), tapping (putting threads in already existing holes), filling (putting ink in recording instruments), testing, calibrating, reworking, and packing.

Among the instruments assembled by these witnesses were the Mini-Monitor, a gas detection device measuring about eight inches long and six inches wide, and the Canary, a small device used to detect the presence of gas in mines. One of the five testified that she did work on sub-assemblies that had previously been done by Intermediate Assemblers in Heavy Assembly, but she conceded on cross-examination that she did not know whether the work was performed in Light Assembly in the same manner that it had been performed in Heavy Assembly. None of the five witnesses could describe the work done in Heavy Assembly; the witnesses had rarely

---

2. The signatory unions were the International Union of Electrical, Radio and Machine Workers (IUERMW) and Local 630 of the IUERMW.

3. Each plaintiff who was classified as a Bench Assembler-A was paid $.40 per straight time hour, $.60 per overtime hour, and $.80 per double-time hour less than a male employed as an Assembler in Heavy Assembly. Each plaintiff who was employed as a Bench Assembler-B

was paid $.60 per straight time hour, $.90 per overtime hour, and $1.20 per double-time hour less than a male employed as an Assembler in Heavy Assembly, and $.20 per straight time hour, $.30 per overtime hour, and $.40 per double-time hour less than a male employed as an Intermediate Assembler in Heavy Assembly.

The parties stipulated that the plaintiffs were within the coverage of the Equal Pay Act.

been in the Heavy Assembly area of the plant. One of the Bench Assemblers-B testified, however, that the devices produced in Heavy Assembly were "large," and another testified that she thought that some of the instruments assembled in Heavy Assembly could be larger than the witness box in which she was sitting.

The plaintiffs then offered a male Intermediate Assembler in Heavy Assembly (labor grade 5) as a witness; this witness, Robert J. Mazzei, was also president of the local union. He testified that his work consisted of, *inter alia*, assembling diesel fuel pump test stands in accordance with blueprints and operation sheets. Photographs introduced into evidence depict these products as having the shape of, but being somewhat larger than, ordinary pinball machines. In the course of doing his job, Mazzei said, he performed such tasks as wiring, soldering, drilling, gluing, reaming, tapping, painting, filling containers with oil, testing, calibrating, reworking, and packing. The aligning that he did sometimes required the use of portable lifts. The witness further testified that he, like most Intermediate Assemblers, spent about fifty percent of his time working on assemblies and sub-assemblies at a bench. But, he averred, other exceptional employees in Heavy Assembly, both labor grades 3 and 5, spent between ninety and ninety-five percent of their time on bench work. There was no indication, however, that the devices assembled at benches in Heavy Assembly were of the same complexity as those assembled at benches in Light Assembly. Mazzei indicated that some jobs formerly performed by Heavy Assemblers, either grades 3 or 5, had been transferred to Bench Assemblers, grade 6, and that some jobs formerly performed by Assemblers in Heavy (grade 3) had been transferred to Bench Assemblers, either grades 5 or 6.

Three females employed as Bench Assemblers-A (labor grade 5) testified that their work consisted of assembling a variety of instruments. They said that their jobs encompassed such tasks as wiring, soldering, drilling, aligning, gluing, reaming, tapping, filling instrument bulbs with gas, rethread-

ing dies, calibrating, and packing. Among the instruments assembled by these witnesses were Tempscribes, which measure and record temperature; Serdexes, which record temperature and humidity; gas detectors; and sub-assemblies for products completed in Heavy Assembly. The size of the instruments they assembled was said to vary in size from "very small" to "quite large," the latter term meaning "about the size of a home movie projector." Some women, one witness testified, used magnifying glasses when working on small devices with a large number of parts.

One witness averred that the work she did on subassemblies was formerly performed by more highly paid males in Heavy Assembly; another said that she assembled instruments that were once assembled by males, but she gave no indication that those males were in Heavy Assembly or that they were more highly paid than she. None of the Bench Assemblers-A called to testify could describe the work done in Heavy Assembly; like the Bench Assembler-B witnesses, they had been in the Heavy Assembly area of the plant only infrequently.

The plaintiffs next presented Edward J. Krepley, who had worked as an Assembler in Heavy Assembly (labor grade 3) until a year before the trial, and who was the union's Chief Steward at the Bacharach plant at the time of the trial. He testified that his work as an Assembler had involved the assembly of fuel pump test stands. In the course of his work, he said, he had done wiring, soldering, drilling, reaming, tapping, filling fuel pump test stands with oil, calibrating, reworking, and packing. Krepley also testified that he had done aligning, which sometimes required the use of a hoist or a forklift. The witness indicated that he himself had spent sixty to seventy percent of his time working at a bench assembling methane monitors and comparators, and explained that the bench work done in Heavy Assembly generally involved preparing parts for sub-assemblies which were then installed in test stands. Krepley testified that some work had been transferred from Heavy Assembly to Light Assembly; the

only specific example he gave was the wiring in a component of a test stand, but he conceded on cross-examination that additional wiring to connect the component to the stand itself had been performed in Heavy Assembly and was not performed in Light. During his testimony, Krepley identified job descriptions for the positions at issue which were admitted into evidence.

The last witness called by the plaintiffs was Bertram Gottlieb, an industrial engineer qualified as an expert. Gottlieb testified that he had made eleven separate visits to the Bacharach plant in order to compare the work of a Bench Assembler-A (grade 5) with an Assembler in Heavy Assembly (grade 3), and to compare the work of a Bench Assembler-B (grade 6) with the work of an Intermediate Assembler in Heavy (grade 5). Based on his observations of workers in the four categories, he described the functions of each position. Bench Assemblers-B (grade 6), he said, did primarily electronic assembly work with hand tools that were "small to medium" in size; Bench Assemblers-A (grade 5) did most of their work on mechanical instruments, and, with the exception of some larger testing and calibrating equipment, used the same tools as Bench Assemblers-B. Intermediate Assemblers in Heavy Assembly, he said, generally assembled diesel fuel pump test stands, but also assembled components for the stands; Assemblers in Heavy (grade 3) did the same work as Intermediate Assemblers, but in addition performed some aligning and testing functions not performed by Intermediates. The same sorts of tools were used in Heavy as were used in Light Assembly, Gottlieb testified, but the tools in Heavy tended to be larger.

Gottlieb averred that in his opinion, based on his observations, the skill, effort, and responsibility involved in the Bench Assembly grade 6 job were substantially equal to the skill, effort, and responsibility involved in the Heavy Assembly grade 5 job, and that both jobs were performed under similar working conditions. He proceeded to reveal the bases for his conclusions.

Gottlieb explained that in comparing the skill required by the two positions, he considered the knowledge, experience, and independent judgment demanded by each. He concluded that the jobs required substantially equal knowledge and experience, and that the Bench Assemblers, working under less supervision, exercised more independent judgment. In comparing the effort required by the two positions, he said, he considered the mental exertion and physical stress demanded by each. Gottlieb opined that the Intermediate Assemblers expended greater physical effort than the grade 6 Bench Assemblers, but that the mental-visual demands on Bench Assemblers were greater than those on the Intermediate Assemblers. On balance, he stated, the combined physical and mental effort expended by the Bench Assemblers slightly exceeded the effort exerted by the Intermediate Assemblers.

Gottlieb related that in measuring the responsibility of the compared jobs, he considered the workers' responsibility for the equipment they used, for the products they produced, for the safety of other people, and for the work of other people. The grade 6 Bench Assemblers and the Intermediate Assemblers, he said, had substantially equal responsibility for the equipment they used, but the Intermediate Assemblers had more responsibility for the items they produced. Gottlieb testified that the Intermediate Assemblers also had more responsibility for the safety of other people. Neither the Bench Assemblers nor the Intermediate Assemblers, he stated, had any responsibility for the work of other people. In comparing the working conditions of the two jobs, Gottlieb explained, he considered the overall work environment, the particular surroundings in the area of the individual workers, and the hazards connected with the two positions. He averred that the overall environment was approximately the same for both jobs, that the conditions around the individual Intermediate Assemblers were worse than the conditions around the grade 6 Bench Assemblers, and that the hazards of both jobs were the same. On balance, he said, the working conditions of the Intermediate Assemblers were slightly

worse than the working conditions of the Bench Assemblers.

Gottlieb then went on to compare the Bench Assembler-A (grade 5) position to the Heavy Assembler (grade 3) position. He announced his conclusion at the outset—that the skill, effort, and responsibility of the two positions were substantially equal, and that the working conditions of both jobs were similar. The same analysis he had used to equate Bench Assemblers-B with the Intermediate Assemblers underlay this conclusion.

Because the grade 5 Bench Assembler position required substantially the same knowledge or education, experience, and exercise of independent judgment as the grade 3 Heavy Assembler position, Gottlieb testified, he believed that the two jobs required equal skill. The Heavy Assemblers expended more physical effort than the Bench Assemblers, he said, but the Bench Assemblers exerted more mental-visual effort; on balance, he thought that the effort required of the grade 5 Bench Assemblers outweighed the effort required of the grade 3 Heavy Assemblers. In discussing responsibility, he noted that the compared positions carried substantially the same responsibility for equipment. According to Gottlieb, however, the Heavy Assemblers had more responsibility for products and for the safety of others, leading him to conclude that overall the grade 3 Heavy Assemblers bore slightly more responsibility than the grade 5 Bench Assemblers. Gottlieb testified that the hazards of the Heavy Assembly position exceeded those of the Bench, and, as a result, stated that the working conditions of the grade 3 Heavy Assemblers were slightly worse than the working conditions of the grade 5 Bench Assemblers.

Gottlieb indicated that after he had observed the compared jobs and formed an independent judgment that they were substantially equal, he had used the National Metal Trades Association Job Evaluation Plan to verify his conclusions. Under that plan, jobs are compared on the basis of eleven different factors; the evaluator assigns points in measuring these factors. When Gottlieb added the points he had assigned to the grade 6 Bench Assembler position and the grade 5 Heavy Assembler position, the totals were 225 and 226, respectively. He had scored the grade 5 Bench Assembler position and the grade 3 Heavy Assembler position at 281 and 286 points, respectively. Gottlieb explained that the evaluation plan he had used was weighted to favor skill factors—education, experience, and initiative—which accounted for fifty percent of the point total.

After hearing the described evidence, the district judge granted the defendant's motion for a directed verdict. He held that the plaintiffs' evidence was insufficient to support an inference that the positions at issue were equal under the Equal Pay Act.[4] Plaintiffs contend on this appeal that their evidence was sufficient to create a jury question on the issue of job equality.

## II.

"Equal pay for equal work." Notwithstanding the simplicity of this phrase—the mandate of the Equal Pay Act of 1963—the federal courts have had no small difficulty in attempting to effectuate the Act's purpose of eliminating wage differentials based on sex.[5] What work is "equal work"? Is the work of a female beautician equal to

**4.** The district court also ruled that the evidence was insufficient to support an inference that the wage differentials shown were sex-based. Some testimony indicated that both males and females were employed in the positions at issue; the court's ruling on sex-based discrimination was apparently made in response to the defendant's argument that, without additional evidence of the sexual composition of the positions, the plaintiffs could not prevail. Plaintiffs moved to reopen their case to offer such addi-

tional evidence, but the district court denied the motion.

In view of our disposition of the issue of job equality, we do not reach the issue whether the district judge erred in his alternative holding or abused his discretion in denying the motion to reopen.

**5.** See House Comm. on Education & Labor, Report on the Equal Pay Act of 1963, H.R.Rep. No.309, 88th Cong., 1st Sess., reprinted in [1963] U.S.Code Cong. & Ad.News 687.

that of a male barber?[6] Is work on a night shift equal to the same work performed on a day shift?[7] Does a female nurse's aide do work equal to that of a male orderly?[8] Questions of this nature abound in cases brought under the Equal Pay Act.

Two precepts chart the course of our analysis. First, in order to make out a case under the Equal Pay Act, employee plaintiffs have the burden of proving that their employer pays different wages to employees of opposite sexes "for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions," 29 U.S.C. § 206(d)(1) (1970). *See Corning Glass Works v. Brennan,* 417 U.S. 188, 195, 94 S.Ct. 2223, 2228, 41 L.Ed.2d 1 (1974). Second, on an appeal from a directed verdict for the defendant, we must examine the record in a light most favorable to the plaintiffs and give them the advantage of every fair and reasonable inference. *See Fireman's Fund Insurance Co. v. Videfreeze Corp.,* 540 F.2d 1171, 1178 (3d Cir. 1976), *cert. denied,* 429 U.S. 1053, 97 S.Ct. 767, 50 L.Ed.2d 770 (1977). "We must determine whether, as a matter of law, the record is critically deficient of that minimum quantum of evidence from which a jury might reasonably afford relief." *Denneny v. Siegel,* 407 F.2d 433, 439 (3d Cir. 1969). In reviewing the evidence adduced, we shall first consider the testimony of the employee witnesses, and then turn to the testimony of the expert, Mr. Gottlieb.

## A.

Plaintiffs contend that the testimony of the employee witnesses gave rise to an inference of job equality in three ways: first, through the enumeration of functions that employees in the compared positions performed; second, through evidence that males in Heavy Assembly did bench work; and third, through evidence that work had been transferred from male positions in Heavy Assembly to lower paid female positions in Light Assembly. We consider the evidence "critically deficient," *Denneny, supra,* on all counts.

The testimony of the employee witnesses provided little insight into the content of the positions they held. And, for purposes of equating jobs under the Equal Pay Act, job content is controlling. *Brennan v. Prince William Hospital Corp.,* 503 F.2d 282, 288 (4th Cir. 1974), *cert. denied,* 420 U.S. 972, 95 S.Ct. 1392, 4 L.Ed.2d 652 (1975). To be sure, both the grade 6 Bench Assemblers and Mazzei, an Intermediate Assembler in Heavy Assembly, recited identical litanies of their functions. Both did cutting, wiring, soldering, drilling, and other tasks. Likewise, the grade 5 Bench Assemblers and Krepley, who had been a grade 3 Assembler in Heavy, intoned the same refrain. Yet there was no evidence to support an inference that each of the functions required substantially the same[9] skill, effort, and responsibility as the other functions; neither was there any evidence to support an inference that employees in the compared positions spent substantially equal amounts of time on the same functions. *See* 29 C.F.R. § 800.123 (1975).[10] On

**6.** This court has said yes, based on the facts of one particular case. *Usery v. Allegheny County Inst. Dist.,* 544 F.2d 148 (3d Cir. 1976), *cert. denied,* —— U.S. ——, 97 S.Ct. 1582, 51 L.Ed.2d 793 (1977).

**7.** This court said no. The Supreme Court disagreed. *Brennan v. Corning Glass Works,* 480 F.2d 1254 (3d Cir. 1973), *rev'd,* 417 U.S. 188, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974).

**8.** Some say yes, some say no. *Hodgson v. Golden Isles Convalescent Homes, Inc.,* 468 F.2d 1256 (5th Cir. 1972) (no); *Brennan v. Prince William Hosp. Corp.,* 503 F.2d 282 (4th Cir. 1974) *cert. denied,* 420 U.S. 972, 95 S.Ct. 1392, 43 L.Ed.2d 652 (1975) (yes). The answer

depends on the work done by each in the particular hospital.

**9.** The test is not identity, but substantial equality. *Usery v. Allegheny County Institution District,* 544 F.2d 148, 153 & n. 4 (3d Cir. 1976), *cert. denied,* —— U.S. ——, 97 S.Ct. 1582, 51 L.Ed.2d 793 (1977).

**10.** The Equal Pay Act did not confer statutory authority upon the Secretary of Labor to promulgate binding regulations covering the enforcement and administration of the Act. Accordingly, we are not bound by the Department of Labor's regulations, but they should be

the contrary, the evidence indicated that the numerous functions varied substantially in difficulty, and that employees in the compared positions spent different amounts of time on the different functions.[11]

Even if we assume that the employees in the compared categories spent substantially equal amounts of time on the same functions, and that each function within each job classification required substantially the same skill, effort, and responsibility or any other function in that classification, there was no evidence to support an inference that the functions performed by Bench Assemblers were substantially equal to the same functions as performed by Heavy Assemblers in the assembly of different instruments. For example, there was no evidence that the cutting performed by grade 5 Light Assemblers was as arduous or as delicate as that performed by grade 3 Heavy Assemblers. The testimony revealed that employees in the compared positions produced vastly different end products— products that differed significantly in size, weight, complexity, and function. That testimony might not have compelled the conclusion that the compared positions were unequal had there been evidence that despite such differences in work product the tasks performed by the Bench Assemblers and the Heavy Assemblers required substantially equal skill, effort, and responsibility. But there was no such evidence, and the lack of meaningful testimony on the content of the compared positions barred even the inference that the jobs required substantially equal skill, effort, and responsibility. The litany of chores faithfully repeated by each employee witness was insufficient to meet the plaintiffs' burden of proving substantial equality; as Representative Frelinghuysen remarked during the congressional debates on the Equal Pay Act, "[m]echanical and surface similarities"

are inadequate to establish the equality of two positions. 109 Cong.Rec. 9196 (1963) (remarks of Rep. Frelinghuysen). *See generally Hodgson v. Brookhaven General Hospital*, 436 F.2d 719, 724 (5th Cir. 1970); 29 C.F.R. § 800.121 (1975); Annot., 7 A.L.R. Fed. 707, 721–23 (1971). The employee witnesses' enumerations of job functions were, under the circumstances of this case, insufficient to give rise to an inference of equality.

The evidence that males in Heavy Assembly did bench work was also critically deficient, for similar reasons. Mazzei, the local union president and an Intermediate Assembler, testified that he, like most Intermediate Assemblers, spent about fifty percent of his time working on assemblies and sub-assemblies at a bench; some exceptional Intermediate Assemblers, he said, spent between ninety and ninety-five percent of their time on bench work. Krepley indicated that while he was a grade 3 Heavy Assembler, he had spent sixty to seventy percent of his time working at a bench assembling methane monitors and comparators; his experience, he said, was not atypical.

The mere fact that certain Heavy Assemblers worked at a bench does not support an inference that the work they did was equal to the work performed by Bench Assemblers in Light Assembly. There was no evidence that could reasonably be interpreted to show that the bench work performed in Heavy Assembly required substantially the same skill, effort, and responsibility as the bench work performed in Light.[12] Indeed, the evidence indicated that the instruments assembled by Heavy Assemblers working at a bench were different from the instruments assembled by Bench Assemblers in Light Assembly. We cannot possibly presume, nor could a jury, that all as-

---

given deference unless inconsistent with the statute. *Usery v. Allegheny County Inst. Dist., supra,* 544 F.2d at 153 n. 3.

**11.** *Compare Brennan v. Prince William Hosp. Corp., supra,* 503 F.2d at 287, in which the court found that differences in the frequency of performance of certain routine tasks by female

nurse's aides and male orderlies were irrelevant because all of the tasks required substantially equal skill, effort and responsibility.

**12.** Gottlieb's vague testimony on this point, unsupported by any explanation or facts of record, does not alter our conclusion.

sembly work is inherently equal merely because it is performed at a bench; a contrary conclusion would ignore the well established rule that the application of equal pay standards depends on actual job requirements and job performance. *See, e. g., Brennan v. Prince William Hospital Corp., supra,* 503 F.2d at 288; *Hodgson v. Behrens Drug Co.,* 475 F.2d 1041, 1049–50 (5th Cir.), *cert. denied,* 414 U.S. 822, 94 S.Ct. 121, 38 L.Ed.2d 55 (1973); *Hodgson v. Brookhaven General Hospital, supra,* 436 F.2d at 724.

Lastly, we find the evidence that some of the plaintiffs performed work formerly done by more highly paid Heavy Assemblers insufficient to support an inference that the work of those plaintiffs was substantially equal to the work of those Heavy Assemblers. This is not a case in which females assumed all the functions previously performed by more highly paid males. *Compare Hodgson v. American Bank of Commerce,* 447 F.2d 416, 422 (5th Cir. 1971); *Shultz v. Saxonburg Ceramics, Inc.,* 314 F.Supp. 1139 (W.D.Pa.1970); *Wirtz v. Koller Craft Plastics Products, Inc.,* 296 F.Supp. 1195, 1197 (E.D.Mo.1968). The record provides no indication of what portion of the work formerly done by any male Heavy Assembler was transferred to any lower paid female in Light Assembly. Even when viewed in the light most favorable to the plaintiffs, the evidence does not suggest that the plaintiffs performed any more than an insignificant part of the duties ever performed by any male in Heavy Assembly. The bald assertion that certain duties were transferred cannot support an inference that the totality of the work performed in the positions to which the duties were transferred required substantially the same skill, effort, and responsibility as the totality of the work performed in the positions from which those duties were removed. Plaintiffs' proof on this issue was not sufficient to carry their burden.[13]

**B.**

We turn now to the testimony of the expert, Gottlieb. The defendant contends that the expert testimony was inadequate because it never established that the jobs compared were substantially equal in content. Notwithstanding Gottlieb's opinions regarding the skill, effort, responsibility, and working conditions of the four positions in dispute, defendant submits, Gottlieb's testimony failed to suggest that the positions he purported to equate had substantially the same content. The plaintiffs, on the other hand, assert that "the Equal Pay Act contains no requirement that the jobs be equal." They argue that the Act demands only "that the performance of the jobs [require] 'equal skill, effort, and responsibility.' "

We agree with the defendant. The Equal Pay Act comprehends a threshold requirement, evident in the legislative history and confirmed in the case law, that the *jobs* to be equated be substantially the same. The requirement of equality of job content inheres in the statutory term, "equal work." Gottlieb's testimony was insufficient to meet this requirement, and, indeed, tended to highlight the significant differences in the essential elements of the jobs he had examined.

We recognize the Equal Pay Act's commendable purposes of overcoming the baseless shibboleth of women's inferiority in the economic market and of eliminating the inequitable effects of wage discrimination merely because of sex. The legislative debates on the Equal Pay Act, however, manifest the congressional concern that the Act not be invoked to mandate equality of pay for jobs of different content. "What we seek is to ensure," Representative Frelinghuysen explained, "where men and women

---

**13.** We have not, of course, only reviewed the employee-witnesses' testimony standing by itself; we have also considered it in light of the expert testimony of Gottlieb, at all times giving the plaintiffs the advantage of every fair and reasonable inference. *See Fireman's Fund Ins.* *Co. v. Videfreeze Corp., supra,* 540 F.2d at 1178, *cert. denied,* 429 U.S. 1053, 97 S.Ct. 767, 50 L.Ed.2d 770 (1977). We have not found the expert testimony to have cured the deficiencies in the employee testimony.

are doing the *same job* under the same working conditions that they will receive the same pay." 109 Cong.Rec. 9196 (1963) (remarks of Rep. Frelinghuysen) (emphasis supplied).

> [T]he jobs in dispute must be the same in *work content,* effort, skill, and responsibility requirements, and in working conditions. . . . [The Act] is not intended to compare unrelated jobs, or jobs that have historically and normally been considered by the industry to be different. Violations usually will be apparent, and will almost always occur in the same work area and where the same tasks are performed.

*Id.* (emphasis supplied).

Representative Goodell, who sponsored the bill that became the Equal Pay Act, echoed Representative Frelinghuysen's comments. He noted that the bill as originally introduced had used the term "comparable work" rather than "equal work." The former term had a well established connotation. During World War II, the regulations of the War Labor Board required equal pay for "comparable" work;[14] under those regulations, the Board had made job evaluations to determine whether pay inequities existed within a plant between even dissimilar positions. *See Schultz v. Wheaton Glass Co.,* 421 F.2d 259, 265 (3d Cir.), *cert. denied,* 398 U.S. 905, 90 S.Ct. 1696, 26 L.Ed.2d 64 (1970). In substituting the term "equal work" for "comparable work," Congress rejected the approach taken by the War Labor Board. Representative Goodell verified the significance of the amendment:

> I think it is important that we have clear legislative history at this point. Last year when the House changed the word

"comparable" to "equal" the clear intention was to narrow the whole concept. We went from "comparable" to "equal" meaning that the jobs involved should be virtually identical, that is, they would be very much alike or closely related to each other.

> We do not expect the Labor Department to go into an establishment and attempt to rate jobs that are not equal. We do not want to hear the Department say, "well, they amount to the same thing," evaluate them so they come up to the same skill or point. We expect this to apply only to jobs that are substantially identical or equal.

109 Cong.Rec. 9197 (1963) (remarks of Representative Goodell).[15]

A dialogue between Representative Goodell and Representative Griffin further explained the concept of equal job content:

> Mr. GOODELL: We are talking about jobs that involve the same quantity, the same size, the same number, where they do the same type of thing, with an identity to them.

> Mr. GRIFFIN: In addition, it would be clear that in comparing inspectors, if one inspects a complicated part of an engine, for example, while another inspector makes only a cursory type of inspection, obviously, the fact that both are inspectors would not mean they should necessarily receive equal pay.

> Mr. GOODELL: I agree with the gentleman.

*Id.*[16]

The courts have given effect to these manifestations of congressional intent, and

---

**14.** The National War Labor Board was created by Executive Order No. 9017, C.F.R. § 1075 (1942).

**15.** Representative Goodell's views as a sponsor of the legislation are entitled to great weight. *See National Woodwork Mfrs. Assn. v. NLRB,* 386 U.S. 612, 629–31, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967).

**16.** Representative Goodell gave general guidelines to indicate the intent of Congress, including the following:

> Tenth. A difference in pay between male selectors and packers and female selectors and packers who work on the same production line and have the same duties and responsibilities would be invalid.

> .    .    .    .    .

> Twelfth. An installer's job on an assembly line that, for example, requires soldering could not be compared or equated with a welder's job.

> Thirteenth. A truck driver's job and a tug operator's job are dissimilar.

have indicated that the concept of equality under the Act embraces job content as well as skill, effort, responsibility, and working conditions. In *Brennan v. City Stores,* 479 F.2d 235 (5th Cir. 1973), for example, the Fifth Circuit noted that "[w]hen Congress enacted the Equal Pay Act, it substituted the word 'equal' for 'comparable' to show that 'the *jobs* involved should be virtually identical, that is, they would be very much alike or closely related to each other.' The restrictions in the Act were meant 'to apply only to *jobs* that are substantially identical or equal.'" *Id.* at 238 (emphasis supplied) (footnotes omitted), *quoting* 109 Cong.Rec. 9197 (1963) (remarks of Rep. Goodell). *Accord, Hodgson v. Golden Isles Convalescent Homes, Inc.,* 468 F.2d 1256, 1258 (5th Cir. 1972) ("It is not merely comparable skill and responsibility that Congress sought to address, but a substantial identity of job functions.") This court made similar remarks in *Shultz v. Wheaton Glass Co., supra,* 421 F.2d at 265. And in a recent Equal Pay Act case in which we held that female beauticians and male barbers in a state hospital were entitled to equal pay, we based our conclusion on the substantial equality of *"[t]he basic job,* skill, effort, and responsibility". *Usery v. Allegheny County Institution District, supra,* 544 F.2d at 153 (emphasis supplied). *Cf.* 29 C.F.R. § 800.-123 (1975).

The expert testimony adduced in this case failed to cure the defects in the testimony of the employee-witnesses, and was insufficient to support an inference that the positions at issue were of substantially equal content.[17] Gottlieb's testimony tended to show the inequality of content. In equating the effort exerted by a grade 6 Bench Assembler in Light Assembly and a grade 5 Intermediate Assembler in Heavy, for example, Gottlieb indicated that the former position involved greater mental-visual ef-

fort, but that the latter required greater physical effort. He gave the same explanation in equating the effort of a grade 5 Bench Assembler and a grade 3 Heavy Assembler. But if the primary content of the compared positions were in fact substantially the same, then it would seem unnecessary to have to balance mental *against* physical effort to support the conclusion that the total effort involved was substantially equal; equal effort on jobs having substantially the same primary content would seem to mean substantially equal mental effort *and* substantially equal physical effort.[18] Although mental effort might perhaps be weighed against physical effort to show the insignificance of incidental differences between two positions having substantially the same primary content, *see Hodgson v. Daisy Manufacturing Co.,* 317 F.Supp. 538 (W.D.Ark.1970), *aff'd in part,* 445 F.2d 823 (8th Cir. 1971); 29 C.F.R. § 800.128 (1975), the counterbalancing in this case did not purport to serve such a limited purpose.

■ Gottlieb's use of the National Metal Trades Association Job Evaluation Plan to verify his independent conclusions did not cure his failure to give any indication that the jobs he equated were of substantially equal content. In addition, his use of the plan was independently defective. He revealed that the positions he compared had scored approximately the same point totals, but he did not state whether he had assigned approximately equal points to the compared positions in each of the skill, effort, responsibility, and working conditions categories. We find nothing in the case law or in the legislative history to support the proposition that the requirements of equal skill, effort, responsibility, and similar working conditions can be aggregated to establish job equality, so that, for example,

---

Fourteenth. The work of a machine operator and the work of a skilled machinist cannot be equated.

Fifteenth. Plant and office clerical assignments are normally distinguishable.

109 Cong.Rec. 9209 (1963) (remarks of Rep. Goodell).

**17.** The job descriptions admitted into evidence did not fill this void. *See generally Brennan v. Prince William Hosp. Corp., supra,* 503 F.2d at 288.

**18.** *Cf.* Committee on Labor and Public Welfare, Report on the Equal Pay Act of 1963, S.Rep.No. 176, 88th Cong., 1st Sess. (1963), at 3.

differences in responsibility between two jobs can be offset by compensating differences in the skill required so as to make the two jobs equal. Rather, we understand the Act to require that the plaintiff bear the burden of proving that the jobs at issue require equal skill, equal effort, equal responsibility, and are performed under similar working conditions. *See* 109 Cong.Rec. 9197 (1963) (remarks of Rep. Griffin) ("The bill refers to jobs, the performance of which require equal skill, equal effort, and equal responsibility, and which are performed under similar working conditions."). Although job evaluation techniques do have an important role to play in Equal Pay Act cases, *see generally Corning Glass Works, supra,* 417 U.S. at 199–209, 99 S.Ct. 2223, the Act implicitly places certain strictures on their use. Those strictures were not observed in this case.[19]

■ In sum, we conclude that Gottlieb's testimony established no more than that the positions at issue were "comparable." We hold that such a showing of comparability of positions was not sufficient to give rise to an inference that those positions were "equal," as that term is used in the Equal Pay Act.

### III.

■ Plaintiffs also contend that the trial court's refusal to admit into evidence a determination letter issued by the Equal Employment Opportunity Commission constituted reversible error. The letter, issued following an ex parte investigation in which the agency conducted no formal proceedings, asserted that there was reasonable cause to believe that Bacharach had violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* (1970 & Supp. III 1973). The determination was based in part on the wage differentials between grade 6 Light Assemblers and grade 5 Heavy Assemblers, and between grade 5 Light Assemblers and grade 3 Heavy Assemblers.

Federal Rule of Evidence 403 provides, in pertinent part, as follows:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . .

The trial judge could properly have concluded that the letter was minimally probative on the substantial equality of content, skill, effort, responsibility, and working conditions between the compared positions. Furthermore, he could properly have determined that such minimal probative value was substantially outweighed by the dangers of unfair prejudice and misleading the jury inherent in an ex parte EEOC evaluation of the ultimate factual issue in the case, an evaluation based only on the agency's having "reasonable cause to believe" that Bacharach's wage differentials were based on sex. We believe that the exclusion of the determination letter was within the sound discretion of the trial judge.

### IV.

Our exhaustive review of the record in the light most favorable to the plaintiffs compels the conclusion that, as a matter of law, their case was "critically deficient of that minimum quantum of evidence from which a jury might reasonably afford relief." *Denneny, supra,* 407 F.2d at 439. The evidence did not support the inference that the job of a Bench Assembler-B (grade 6) was equal to the job of an Intermediate Assembler in Heavy Assembly (grade 5) or of an Assembler in Heavy (grade 3), nor that the job of a Bench Assembler-A (grade 5) was equal to the job of a grade 3 Heavy Assembler.

Accordingly, the judgment of the district court will be affirmed.

---

**19.** The Act accords no greater weight to skill than to effort, responsibility, or working conditions, yet Gottlieb's evaluation plan weighted skill as being equal in importance to the other three factors combined.