**Arvella W. KOHNE et al., Individually and on behalf of all others similarly situated, Plaintiffs,**

**v.**

**IMCO CONTAINER COMPANY, Defendant.**

**Civ. A. No. 74–110(H).**

United States District Court, W. D. Virginia, Harrisonburg Division.

June 12, 1979.

Richard T. Seymour, Lawyers' Committee for Civil Rights Under Law, Washington, D. C., Jay J. Levit, John B. Mann, Richmond, Va., for plaintiffs.

Thomas J. Manley, Hunton, Williams, Gay & Gibson, Francis V. Lowden, III, Richmond, Va., for defendant.

## MEMORANDUM OPINION AND ORDER

TURK, Chief Judge.

This is an action against IMCO Container Company, a division of Ethyl Development Corporation, by twelve hourly paid female employees, past and present, of its plant in Harrisonburg, Virginia, seeking individual and class relief for alleged sexual discrimination in employment under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* On February 2, 1972, several of the named plaintiffs to this suit and a number of other female employees filed a charge of discrimination with the Equal Employment Opportunity Commission. Subsequently, that charge was joined in and supplemented by other female employees including the remaining named plaintiffs. The combined charges allege pervasive sex based employment discrimination by IMCO. On November 12, 1973, the E.E. O.C. notified the charging parties of their right to sue, and this action was commenced on December 13, 1973. Plaintiffs maintain that the defendant discriminated against them in particular and females in general by compensating women at a lesser rate of pay than men for substantially equivalent work, by assigning women to less desirable or lesser paying jobs, by permitting women less relief or break time and pay, shift preferences, and other employment benefits and opportunities, including the opportunity to work overtime, and by applying more onerous work and disciplinary standards to women than to men. The court tentatively defined the class as "[a]ll women employed in production jobs at IMCO Container Company's Harrisonburg plant at any time after February 2, 1970." Trial began on October 14, 1975, and concluded on November 8, 1975, with the record being reopened on July 12, 1976, for the receipt of additional evidence.

## CLASS CERTIFICATION

As previously stated, the court tentatively defined the class as all women employed in production jobs at IMCO Container Company's Harrisonburg plant at any time after February 2, 1970. The court now finds the proper class for certification to be all women employed in production jobs at the plant at any time after August

6, 1971.[1] The August 6, 1971 date is the 180th day from February 2, 1972, the date on which a charge was filed with the Equal Employment Opportunity Commission. On the date the charge was filed with the Commission, the limitation period was 90 days. Congress, however, amended the 90-day limitation period to 180 days, Equal Employment Opportunity Act of 1972, Pub.L. 92–261, § 4, 86 Stat. 103 (amending 42 U.S.C. § 2000e–5(e)), and this amendment became effective on March 24, 1972.

Section 14 of the amending act provides that the amendments are to "be applicable with respect to charges pending with the Commission on the date of [their] enactment  . . . ." In considering the amendments the Supreme Court held in *International Union of Electrical Workers, Local 790 v. Robbins & Myers, Inc.*, 429 U.S. 229, 243, 97 S.Ct. 441, 450, 50 L.Ed.2d 427 (1976) that "Congress intended the 180-day period to be applicable to charges such as that filed by [plaintiff], where the charge

---

1. This action has proceeded as if there had been a formal order of certification. Treating the action as maintainable under Federal Rule of Civil Procedure 23(b)(3) the court directed that individual notice be given class members in accordance with Rule 23(c)(2). Prospective class members were notified of the claims being asserted, that they would be excluded from the class upon request, that a judgment, whether favorable or not, would include all members not requesting exclusion, and that any member not requesting exclusion could, if she desired, enter an appearance through her counsel. In addition, they were notified that those not requesting exclusion, who were claiming monetary relief because they were denied a job or job opportunity because of their sex, would be required to file a claim form in order to be considered a claimant for monetary relief because of their job assignment. Although there has been no formal order of certification, therefore, the notice requirements of Rule 23(c)(2) have been complied with. The court's action at this time is merely formalization of that which has previously been done. While a district court cannot simultaneously render a decision on the merits and certify an action under Rule 23(b)(3) because of the notice requirement of Rule 23(c)(2), *Roberts v. American Airlines*, 526 F.2d 757, 762–763 (7th Cir. 1975); *Peritz v. Liberty Loan Corp.*, 523 F.2d 349, 354 (7th Cir. 1975), nothing precludes certification where the notice provisions have been complied with.

The court has not previously entered by formal order its reasons for class certification. In accordance with the directives of *Barnett v. W. T. Grant Co.*, 518 F.2d 543, 546–548 (4th Cir. 1975), the court now sets forth those reasons. All individual plaintiffs are now or have been employed in production jobs at IMCO. More particularly, all were initially assigned to the Secondary and Decoration Departments at the plant. At the time this action was filed there were approximately two hundred women in production jobs at the plant, all assigned initially to the Secondary and Decoration Departments. Moreover, there have been several hundred females in production jobs since August 6, 1971. Plaintiffs contend that defendant maintained sexually segregated departments

and job classifications and has otherwise discriminated against females at the plant in matters of seniority, promotion, and pay, and plaintiffs allege that they have been discriminated against in all the same basic ways that the class which they seek to represent has been discriminated against. The court is satisfied, therefore, that the dictates of *East Texas Motor Freight System v. Rodriguez*, 431 U.S. 395, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977), as explained in *Hill v. Western Electric Co., Inc.*, 596 F.2d 99 (4th Cir. 1979), have been met. For these reasons, it is readily apparent that the class is so numerous that joinder of all members is impracticable, that there are questions of law and fact common to the class, that the claims and defenses of the representative parties are typical of the claims and defenses of the class, and that the representative parties will fairly and adequately protect the interest of the class. The court, therefore, finds the requirements of Rule 23(a) to have been met. Furthermore, the court finds the factual and legal bases for individual claims to be the same in most respects to those of the class in general. The court, accordingly, finds the questions of law and fact common to the members of the class to predominate over any questions affecting only individual members. The court also finds the maintenance of a class action to be superior to other available methods for the fair and efficient adjudication of the controversy. Consequently, the case is found to be maintainable as a class action under Federal Rule of Civil Procedure 23(b)(3).

The court also notes that if plaintiffs' allegations are substantiated then IMCO has acted on grounds generally applicable to the class, making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole. Consequently, the action is also maintainable as a class action under Federal Rule of Civil Procedure 23(b)(2). *Barnett v. W. T. Grant Co., supra; Wetzel v. Liberty Mutual Insurance Co.*, 508 F.2d 239 (3d Cir. 1975), *cert. denied* 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679; *Robinson v. Lorillard Corp.*, 444 F.2d 791, 801–802 (4th Cir. 1971), *petition for cert. dismissed*, 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655 (1972).

was filed with the EEOC prior to March 24, 1972, and alleged a discriminatory occurrence within 180 days of the enactment of the Act." As the present charges were pending with the Commission on March 24, 1972, and as those charges alleged a discriminatory occurrence within 180 days of that date, it is clear that the amendments are applicable. *Wood v. Southwestern Bell Telephone Co.*, 580 F.2d 339 (8th Cir. 1978). It is equally clear that irrespective of the continuing nature of the employer's violations, a severing of the employment relationship terminates the discrimination against the severed employee and that employee must, accordingly, file a charge of discrimination with the Commission within 180 days from the date the employment relationship terminated. Consequently, the class cannot properly include persons who were last employed by the defendant more than 180 days from the date the charge was filed with the Commission. *Laffey v. Northeast Airlines, Inc.*, 185 U.S.App.D.C. 322, 366, 567 F.2d 429, 473 (D.C.Cir.1976), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1281, 55 L.Ed.2d 792 (1978); *Wetzel v. Liberty Mutual Insurance Co.*, 508 F.2d 239, 246 (3d Cir. 1975); *Lazarus v. Maryland*, 79 F.R.D. 633 (D.Md.1978). *See generally, United Air Lines, Inc. v. Evans*, 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977); *King v. Seaboard Coast Line Railroad Co.*, 538 F.2d 581, 583, n.5 (4th Cir. 1976).

### ORDER OF BIFURCATION

█ The court previously ordered the trial bifurcated and ordered the trial of "[a]ll issues of [d]efendant's liability to individuals included in the class, including any claims of job assignment or promotion denial . . . ," at the first or "liability stage" of trial. Consistent with that order prospective class members were notified that if they did not request exclusion from the class their claims for monetary relief would be precluded unless a claim form was filed. In turn, class members were correctly notified by counsel that if they had a job assignment or promotion claim, according to the court's order, they would be required to testify or the claim would be barred.

The court is now satisfied, however, that it would be improper to exclude for back-pay purposes those individuals not offering testimony at the "liability stage" of trial. Federal Rule of Civil Procedure 23(c)(2)(B) provides that a judgment in a 23(b)(3) action "will include all members who do not request exclusion." It is, therefore, the clear thrust of the rule to require no affirmative action by class members for inclusion within the class. Consequently, requiring class members to "opt in" at the first or "liability stage" of trial was contrary to the spirit of Rule 23(b)(3). *Robinson v. Union Carbide Corp.*, 544 F.2d 1258 (5th Cir. 1977), *modifying* 538 F.2d 652 (1976), *cert. denied*, 434 U.S. 822, 98 S.Ct. 65, 54 L.Ed.2d 78 (1977). Accordingly, the court will allow back-pay recovery by individual class members irrespective of whether they filed claim forms prior to or testified at the *liability* stage of trial so long as entitlement is established at the "back pay" stage of trial.

The parties' respective burdens, when liability to the class is established, governing the manner in which the court will proceed, were described by the court of appeals in *Sledge v. J. P. Stevens & Co., Inc.*, 585 F.2d 625 (4th Cir. 1978):

> Ordinarily, once it is shown at the first, or "liability" stage of a bifurcated class action, as it was here, that an employer has engaged in a pattern of illegal discrimination against Negroes by disproportionately denying them employment and assigning those who are hired to lower-paying jobs than whites, it is then presumed that individual hiring or job assignment decisions were infected by discrimination and that victims of those decisions are entitled to make-whole awards. All an individual plaintiff must then establish at the second or "back pay" stage of trial is (a) his identity as one of the presumed discriminatees—that he is black and that during the period in controversy he applied for employment and was not hired, or upon being hired was assigned to one of the low-paying jobs, and (b) any information requested

of him to assist the court in determining the amount of the economic loss he suffered as a result. The burden then shifts to the employer to demonstrate by a preponderance of the evidence, if it can, that factors other than the condemned discrimination caused the decision of which the particular back pay claimant complains, e. g., that with respect to the unsuccessful applicant there were no job openings or at least none for which he was qualified, or that with respect to the employee assigned to undesirable work no better jobs were vacant or at least none for which he was qualified. If this burden is met compensation may be denied unless the claimant can show that the exculpatory reason advanced by the employer is mere pretense—that, for example, white persons with qualifications identical to those of the claimant or who also did not meet the prescribed qualifications were nonetheless assigned to the position sought.

*Id.*, at 637.

## JURISDICTION OF CONTINUING VIOLATIONS

■ In *United Airlines, Inc. v. Evans*, 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977), the plaintiff, a female, was forced to resign in 1968 due to a company rule forbidding stewardesses to marry. The rule was subsequently rescinded, and in 1972 plaintiff was rehired but given no seniority credit for her earlier service because defendant's seniority system recognized only uninterrupted employment. Approximately one year from the date she was rehired plaintiff filed a charge with the E.E.O.C. maintaining that her low seniority rank constituted a "continuing violation" of Title VII. Finding her charge of discrimination to have been untimely filed the Supreme Court reasoned that while United's seniority system gave present effect to a past act of discrimination, it was entitled to treat that past act as lawful after plaintiff failed to file a charge of discrimination within the 90 days then allowed by § 706(d) of the Civil Rights Act of 1964. The court stated that "[a] discriminatory act which is not made the basis for a timely charge is the legal equivalent of a discriminatory act which occurred before the statute was passed," constituting only "relevant background evidence in a proceeding in which the status of a current practice is at issue . . . ." *Id.*, at 558, 97 S.Ct. at 1889. According to the court, United's seniority system did, in fact, have a continuing impact on her pay and fringe benefits but, in such cases, the court emphasized "the critical question is whether any present violation exists." *Id.*, at 558, 97 S.Ct. at 1889.

Relying on *Evans*, defendant maintains that the court lacks jurisdiction to remedy any act of discrimination occurring prior to November 4, 1971, the date 90 days prior to filing of the earliest charge with the Commission. As previously stated, the court finds the appropriate time period to be 180 days. The court also finds defendant's reading of *Evans* to be overly broad. *Evans* held "that the mere allegation of continuing *effects* of a past act of discrimination is insufficient to constitute a continuing *violation* so as to satisfy the timely filing requirements of Title VII." *Wilson v. Allied Chemical Corp.*, 456 F.Supp. 249, 252 (E.D.Va.1978). Where plaintiffs allege continuing *violations*, however, not just continuing *results* of past violations, they are not precluded from raising events prior to the 180-day limitation period of Title 42 U.S.C. § 2000e–5(e). *White v. City of Suffolk*, 460 F.Supp. 516, 519–520 (E.D.Va. 1978); *Wilson v. Allied Chemical Corp.*, supra. See *Patterson v. American Tobacco Co.*, 586 F.2d 300 (4th Cir. 1978); Comment, *Continuing Violations in Private Suits Under VII*, 32 Ark.L.Rev. 381 (1978). In *Patterson* defendant employer contended that *Evans* stands for the proposition that a promotional system may not be modified despite a finding of a "present impact" violation when plaintiffs failed to file a challenge to the system within 180 days of its adoption. In rejecting this argument the court gave the following explanation of *Evans*:

> *Evans* dealt only with a one-time violation (a discriminatory discharge) which

had a continuing effect only as a result of an otherwise neutral seniority system. It did not deal with a continuing violation such as a discriminatory promotional system where a specific violation continues from day to day and a specific violation occurs whenever a promotion is made. *Evans* does not purport to limit the broad remedial powers of a federal court. But for § 703(h) and its validation of the present effects of a bona fide seniority system, a court, in a proper case, like the instant one, may still redress the present effect of a past discrimination by requiring the modification of present practices which repeat that discrimination.

*Id.*, at 304. In the present case, plaintiffs do not simply claim pre-Act or pre-limitation period discrimination practices having continuing discriminatory effect. They have alleged discriminatory practices continuing within the 180-day period prior to the filing of charges with the Commission. Accordingly, the court has jurisdiction to remedy those practices if proven.

## LIMITATIONS PERIOD FOR BACK PAY

■ A 1972 amendment to the Equal Employment Opportunity Act, Pub.L. 92–261, § 4(a), 86 Stat. 103 (amending 42 U.S.C. § 2000e–5(g)) expressly limits liability for back pay to a period beginning two years prior to the filing of a charge with the Commission. Prior to the 1972 amendment no limitation for back pay was prescribed by the Act and the period of potential monetary liability for continuing discrimination was governed by the applicable state statute of limitations which was tolled by the filing of charges with the E.E.O.C. *See Sledge v. J. P. Stevens & Co., supra*, at 650–651. As explained in the court's order of class certification, § 14 of Public Law 92–261 provides that the amendments to § 706 of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5, are applicable with respect to charges pending with the Commission on March 24, 1972. It has been held however, that as to actions pending in the courts when the new legislation was enacted on March 24, 1972, the amendments are inapplicable and the pertinent state statute of limitations applies. *Sledge v. J. P. Stevens & Co., Inc., supra*, at 650–651. If the state statute of limitations differs from the two-year period prescribed by Title 42 U.S.C. § 2000e–5(g), then interpretive problems arise. In the event that the state statute of limitations is more than two years then the period for which a claimant could receive back pay would be shortened by the application of the amendment, and if the state limitation period is shorter than two years then application of the amendment would extend the employer's potential back-pay liability.

In the present case, the court finds that the state statute of limitations in effect at the time the charges were filed with the E.E.O.C. was two years. *See Equal Employment Opportunity Commission v. Christiansburg Garment Co., Inc.*, 376 F.Supp. 1067 (W.D.Va.1974). Consequently, irrespective of whether the back-pay amendment or the Virginia statute of limitations is applied, back pay would not accrue prior to February 2, 1970, the date two years prior to the filing of charges with the Commission.

## FINDINGS OF FACT

A. Jurisdiction

Each plaintiff is a female, present or former, hourly employee of the IMCO plant in Harrisonburg, Virginia. The defendant, IMCO Container Company, a division of Ethyl Development Corporation, is, and has been at all times relevant to this action, an employer engaged in an industry affecting commerce, within the meaning of § 701 of the Civil Rights Act of 1964, 42 U.S.C. § 2000e.

B. General factual findings

1. The defendant operates a plant in Harrisonburg, Virginia, where it manufactures and decorates plastic bottles. The plant is composed of one maintenance and six production departments, which, at the time this action was filed, employed approx-

imately three hundred hourly employees disbursed over three shifts. The six production departments are Grinding and Compounding, Molding, Secondary, Decoration, Shipping, and Quality Control. The following is a breakdown by sex and number of the various job categories within their respective departments in January of 1974:

| | Total in Job Category | No. of Males | No. of Females | Percent Female |
|---|---|---|---|---|
| **Grinding and Compounding Department** | | | | |
| Foreman | 1 | 1 | 0 | 0.0% |
| Grinders or Compounders | 7 | 7 | 0 | 0.0% |
| Dept. Total | 8 | | | |
| **Molding Department** | | | | |
| Foremen | 4 | 4 | 0 | 0.0% |
| Foremen-in-Training | 2 | 2 | 0 | 0.0% |
| Molders | 22 | 22 | 0 | 0.0% |
| Dept. Total | 28 | | | |
| **Secondary Department** | | | | |
| Foremen | 4 | 4 | 0 | 0.0% |
| Foremen-in-Training | 2 | 2 | 0 | 0.0% |
| Preventative Maintenance | 1 | 1 | 0 | 0.0% |
| Utility | 4 | 4 | 0 | 0.0% |
| Leader | 3 | 0 | 3 | 100.0% |
| Assistant Leader | 3 | 0 | 3 | 100.0% |
| Material Handler | 5 | 5 | 0 | 0.0% |
| Machine Operator | 72 | 0 | 72 | 100.0% |
| Dept. Total | 94 | | | |
| **Decoration Department** | | | | |
| Foremen | 3 | 3 | 0 | 0.0% |
| Foremen-in-Training | 3 | 3 | 0 | 0.0% |
| Maintenance | 1 | 1 | 0 | 0.0% |
| Administrative Leader | 1 | 0 | 1 | 100.0% |
| Utility | 4 | 4 | 0 | 0.0% |
| Leader | 6 | 0 | 6 | 100.0% |
| Assistant Leader | 3 | 0 | 3 | 100.0% |
| Material Handler | 6 | 5 | 1 | 16.7% |
| Silk Screen and/or Ink Blender | 2 | 0 | 2 | 100.0% |
| Machine Operator | 112 | 0 | 112 | 100.0% |
| Dept. Total | 141 | | | |
| **Shipping Department** | | | | |
| Foreman | 1 | 1 | 0 | 0.0% |
| Warehouseman | 1 | 1 | 0 | 0.0% |
| Shippers | 5 | 4 | 1 | 20.0% |
| Dept. Total | 7 | | | |
| **Quality Control Department** | | | | |
| Foreman | 1 | 1 | 0 | 0.0% |
| Inspectors | 9 | 0 | 9 | 100.0% |
| Dept. Total | 10 | | | |
| **Maintenance Department** | | | | |
| Foreman | 1 | 1 | 0 | 0.0% |
| Machinist | 1 | 1 | 0 | 0.0% |
| Maintenance | 3 | 3 | 0 | 0.0% |
| Maintenance Trainee | 1 | 1 | 0 | 0.0% |

| | Total in Job Category | No. of Males | No. of Females | Percent Female |
|---|---|---|---|---|
| Maintenance Department—Cont'd | | | | |
| Utility | 1 | 1 | 0 | 0.0% |
| Building Maintenance | 3 | 2 | 1 | 33.3% |
| Dept. Total | 10 | | | |
| PLANT TOTAL | 298 | | | |

2. A general description of the work performed in each department, including a general description of the duties of the personnel in each department, is as follows:

*Grinding and Compounding Department:* The manufacturing process begins in the Compounding Department where plastic resin is compounded to colors and densities according to customer specification. The compound is then delivered by chutes or bins directly to the Molding Department. Grinders in the Compounding Department are responsible for grinding usable scrap for future use. The foreman in the Compounding and Grinding Department is charged with supervisory, planning, and reporting functions within the department and must be able to perform the duties of all persons under his supervision if required.

*Molding Department:* The plastic resin compound delivered to the Molding Department is heated and placed in molding machines where it is molded to desired shape and thickness. Molding operators are responsible for the production functions in the Molding Department. A foreman is charged with supervisory, planning and reporting functions within the department, and must perform the duties of all persons under his supervision as required. A foreman-in-training assists the foreman and in the foreman's absence assumes his duties.

*Secondary Department:* Molded bottles are separately finished in the Secondary Department by the manual removal of excess plastic and the reaming of bottle necks and smoothing of bottle exteriors on individual core and trim machines. The Secondary Department has numerous machine operators operating a variety of machines which perform finishing functions and which prepare bottles for delivery to the Decoration Department. Material handlers are responsible for machine supply and product movement as well as some machine maintenance tasks. The utility job primarily involves the maintenance and adjustment of the operators' machines but also includes material handling chores. The job of preventative maintenance involves performance of major machine overhaul and repair. Leaders are responsible for scheduling individual machines, maintaining inventory, and relieving operators if necessary. Assistant leaders are responsible for assisting leaders in their duties and assuming their duties in their absence. The foreman is charged with supervisory, planning and reporting function within the department. He is responsible for production on his respective shift. He is also responsible for machine repair and set-up. A foreman-in-training assists the foreman and assumes his responsibilities in his absence. [The utility job category in Secondary, which included both material handling and machine set-up and repair, was discontinued in 1975, and the functions of the job were assumed by the foreman, foreman-in-training, and material handlers.]

*Decoration Department:* Completed bottles from the Molding and Secondary Departments are delivered by material handlers to the Decoration Department for the application of prints and designs on a variety of individual machines. Persons operating these machines are also responsible for reinspecting and packaging completed bottles. At various times machine operators also work as bottle washers and some relieve other operators. Persons employed in the job category known as screen maker and ink blender are responsible for prepar-

ing screens and mixing inks which are used in the decoration process. Material handlers are responsible for machine supply and product movement as well as some machine maintenance tasks. The utility job primarily involves the maintenance and adjustment of the operator's machines but also includes some material handling chores. The job of preventative maintenance involves the performance of major machine overhaul and repair. Leaders are responsible for scheduling individual machines, maintaining inventory, and relieving operators if necessary. Assistant leaders are responsible for assisting leaders in their duties and assuming their duties in their absence. The foreman is charged with supervisory, planning and reporting functions within the department. He is responsible for production on his respective shift. He is also responsible for machine repair and setup. A foreman-in-training assists the foreman and assumes his responsibilities in his absence. [As in the Secondary Department, the utility job in Decoration was discontinued in 1975 and the responsibilities assumed by material handlers and foreman. Later, however, the job was restaffed.]

*Shipping Department:* The finished product is delivered to the Shipping Department and stored in the warehouse for loading and shipping. The Shipping Department also receives all material destined for eventual use in the plant. The warehouseman is responsible for managing warehouse space, moving incoming and outgoing materials, loading trucks, and maintaining warehouse records. The shipper loads and unloads materials coming to and leaving the plant by truck and stores materials in the warehouse. The foreman is charged with supervisory, planning, and reporting functions within the department. He also performs the duties of all persons under his supervision, as required.

*Quality Control:* The Quality Control Department is responsible for maintaining

product standards. Quality control inspectors perform quality control checks on bottles which are sampled at various phases of the production process. The foreman is charged with supervisory, planning, and reporting functions within the department. He also performs such quality control duties as may be required.

*Maintenance:* The Maintenance Department is responsible for maintenance of the entire plant, including major machine repairs. The machinist is responsible for operating and maintaining the machine shop where he makes and repairs parts of production and nonproduction machinery. The maintenance man is responsible for making electrical repairs on equipment and fixtures, installing new electrical equipment and fixtures, maintaining all production and nonproduction mechanical equipment, and maintaining plumbing, heating, and air conditioning equipment. The maintenance trainee is responsible for assisting the maintenance personnel in their duties. The utility man issues daily supplies to the various departments, picks up supplies and stores them in their proper places, assists in various housekeeping functions, and acts as a watchman on certain days. Building and grounds maintenance personnel are responsible for nonmechanical building and grounds maintenance and perform the duties as watchman on certain days. The foreman is charged with supervisory, planning, and reporting functions within the department and performs other duties within the province of his department, as required.

3. The top pay rates for the various hourly jobs at IMCO, in descending order, were as follows on March 3, 1975: [2]

| Job Title | Maximum hourly pay rate |
|---|---|
| Machinist | $4.45 |
| Foreman (Production & Maintenance Departments) | 4.35 |
| Maintenance Machinist | 4.27 |

2. The March 3, 1975 pay rates table is used to show relative pay rates. With the exceptions of lead and assistant lead lady positions, which at one time were compensated at machine operator rates and the job of screen maker and ink blender which was compensated at utility man rates prior to 1970, the relative positions of the various job categories have remained the same in the financial hierarchy since 1959.

| Job Title | Maximum hourly pay rate |
|---|---|
| Foreman (Compounding, Shipping & Quality Control Departments) | 4.25 |
| Foreman-in-training (Production Departments) | 4.20 |
| Molder | 4.05 |
| Maintenance Trainee & Warehouseman | 3.90 |
| Quality Control Inspector | 3.77 |
| Utility | 3.75 |
| Grinder & Compounder | 3.69 |
| Shipper | 3.69 |
| Lead Lady | 3.62 |
| Assistant Lead Lady | 3.51 |
| Material Handler | 3.45 |
| Screen Maker & Ink Blender | 3.45 |
| Building & Ground Maintenance | 3.30 |
| Machine Operator (Secondary & Decoration Departments) | 3.30 |

4. Defendant contends that it maintains the following job selection system:

The entry level job at the Harrisonburg plant is that of machine operator in either the Secondary or Decoration Department. Other jobs are filled by the posting of vacancies for bidding by incumbent employees and if no qualified incumbent fills a vacancy it is filled from a pool of applicants from outside the plant. Except for occasional "formal" training to improve individual performance on a job already assigned, training at the plant is largely on-the-job training with supervisory assistance.

Experience is required in the jobs of foreman and foreman-in-training, lead and assistant lead ladies, quality control inspector, preventative maintenance, machinist and utility man. The foreman or foreman-in-training must be familiar with and knowledgeable about the work areas, machines, and processes normally assigned to subordinates. The foreman must also be able to perform maintenance and material handling tasks and be capable of performing in a supervisory capacity. Lead and assistant lead ladies must be familiar with departmental production processes and scheduling, be able to operate certain machines for relief work if necessary, and perform certain supervisory functions. The quality control inspector must have a basic knowledge of bottle processing and quality expec-

tation as well as the various factors influencing defects. Preventative maintenance and machinists are skilled positions requiring advanced apprenticeship or past experience and skills in such matter as electricity, mechanics, heating and air conditioning, hydraulics, and tool and die work. The utility man must have a general familiarity with plant lay-out, as well as fundamental machine repair. He must also be competent in material handling.

According to defendant's response to plaintiff's interrogatories, "[f]rom the bids obtained, selection is based upon the following criteria in the sequence listed:

1. Qualification for the job for which the bid is made.

2. Past on-the-job performance indicative of provable success or failure in the new position.

3. Length of service. When the qualifications and past performance of two or more bidders are approximately equal, greater length of service will be the determining factor."

5. According to defendant an employee accumulates competitive plant seniority commencing on the date of hire. When a vacancy occurs in a job above the purported entry level operator job, the employees already in that job category use their plant seniority to select their shift preferences. The job on the remaining shift is then plant wide for bids by interested employees. It is asserted that bidders are then arranged in order of hire date seniority and, qualifications being relatively equal, the bidder with the greatest plant seniority is awarded the job. The successful bidder then receives full plant seniority credit in the new job for purposes of subsequent shift realignments and pay rates. Prior to 1974, however, the incumbent employees used their length of service in the job category to select shift preferences.

C. Class claims—job assignments generally

1. Prior to January of 1972, no female at IMCO had ever been assigned, transferred, or promoted to any hourly job other

than machine operator in the Secondary and Decoration Departments, lead or assistant lead lady, screen maker and ink blender, or quality control inspector. Consequently, until that date only males were assigned, transferred, or promoted to grinder, compounder, molder, utility, material handler, preventative maintenance, warehouseman, shipper, machinist, general maintenance, maintenance trainee, building and grounds maintenance, foreman, and foreman-in-training job categories. In 1973, females were assigned for the first time to the jobs of material handler and building and grounds maintenance. In 1972 a female was assigned to the Shipping Department. Similarly, on December 7, 1972, the defendant initially assigned the first man to the job of machine operator in the Secondary Department.

2. As of October of 1974, no female had been initially assigned to any job other than machine operator or quality control inspector. On the other hand there were initial assignments of males to all non-skilled job categories.

3. As noted above, in 1972 females were assigned for the first time to the jobs of material handler, and building and grounds maintenance and in 1973, a female was assigned to the Shipping Department. Through October of 1974, however, no females had been assigned or promoted to grinder, compounder, molder, preventative maintenance, utility, warehouseman, general maintenance, maintenance trainee, machinist, foreman, and foreman-in-training job categories.

From the plant's opening in 1959 through October of 1974, out of approximately 697 persons assigned to the job of machine operator in the Secondary and Decoration Departments, approximately 693 were females and only four were males. During the same period of time, however, there were 90 assignments to the job of molder, 20 initial and 70 by transfer, and 50 assignments to the jobs of grinder and compounder, 34 initial and 16 by transfer. All were assignments of males. During this period of time there were also 42 assignments to the Shipping Department, 41 male and one female. Prior to 1973, however, no female had been assigned to the Shipping Department. From the plant's opening in 1959 through October of 1974, there were 242 assignments to the job of material handler, 214 initial assignments and 28 by transfer. Of these, eight were females who transferred from other jobs. Prior to December of 1972, however, no female ever held the job of material handler. Prior to 1970 only males were assigned to the job of screen maker and ink blender and after 1970 only females were assigned. In the Maintenance Department, except for one female who began working in the building and grounds maintenance job on January 31, 1972, as of the time of trial, there had never been a female employee. On the other hand, the job of inspector in the Quality Control Department is, and always has been predominately female, and as of January of 1974, with the exception of the job of foreman or chief inspector, all persons in that department were female.

5. The following is a breakdown by sex of assignments to unskilled job categories having more numerous positions, first, from the opening of IMCO in 1959, through October 1974, the period for which pertinent records were maintained and second, from August 6, 1971, the 180th day before charges were filed with the Equal Employment Opportunity Commission.[3]

| | 1959 through October, 1974 | August 6, 1971 through October, 1974 |
|---|---|---|
| GRINDING & COMPOUNDING DEPT. | | |
| Initial assignments males | 34 | 23 |
| Initial assignments females | 0 | 0 |
| Transfers males | 16 | 3 |
| Transfers females | 0 | 0 |
| TOTAL | 50 | 26 |

3. See plaintiffs' exhibit 8.

| | 1959 through October, 1974 | August 6, 1971 through October, 1974 |
|---|---|---|
| **MOLDING DEPT.** | | |
| Initial assignments males | 20 | 17 |
| Initial assignments females | 0 | 0 |
| Transfers males | 70 | 24 |
| Transfers females | 0 | 0 |
| TOTAL | 90 | 41 |
| **SHIPPING DEPT.** | | |
| Initial assignments males | 15 | 9 |
| Initial assignments females | 0 | 0 |
| Transfers males | 26 | 9 |
| Transfers females | 1 | 1 |
| TOTAL | 42 | 19 |
| **SECONDARY & DECORATION DEPTS.** (material handlers) | | |
| Initial assignments males | 214 | 110 |
| Initial assignments females | 0 | 0 |
| Transfers males | 20 | 5 |
| Transfers females | 8 | 8 |
| TOTAL | 242 | 123 |
| **SECONDARY & DECORATION DEPTS.** (machine operators) | | |
| Initial assignments males | 4 | 4 |
| Initial assignments females | 684 | 437 |
| Transfers males | 0 | 0 |
| Transfers females | 9 | 6 |
| TOTAL | 697 | 447 |

6.  Evidence subsequent to 1975 indicates significant integration at the plant by females of traditionally male jobs.

D.  Class claims—initial job assignments to entry level positions

1.  While only the job of machine operator is designated by the defendant as entry level, the job of material handler is also entry level in that it is filled mainly through initial assignments of persons without special job skills who receive on-the-job training.

2.  The defendant has not raised and the evidence does not establish a bona fide occupational qualification defense on account of sex to the job of material handler.

3.  From 1959 through October of 1974, there were 214 *initial* assignments to material handling jobs. All were males. During the same period of time there were 688 initial assignments to machine operator jobs, 684 females and four males. From August 6, 1971, the 180th day prior to the filing of a charge with the Commission, through October, 1974, there were 110 males and no females initially assigned to material handling jobs. For that period of time there were 441 initial assignments to machine operator jobs, four males and 437 females.

4.  In terms of their qualifications for material handling jobs, there is no evidence that the females assigned to machine operator jobs in the Secondary and Decoration Departments were less qualified by reason of skill or previous work experience than the males who were assigned to material handling jobs. The absence of females, therefore, in the higher paying material jobs, is not a product of their relative lack of qualifications.

5.  It appears, from the above facts, that a large number of females qualified to perform material handling jobs were routinely assigned to machine operator jobs during the same period of time that a large number of males, undifferentiated by skill or experience, were assigned to the higher paying material handling jobs.

6.  Applications for employment at IMCO were usually in the form of general requests for employment and were infrequently directed to particular job categories. From the opening of the plant until February of 1975, the same personnel clerk did virtually all of the interviewing and hiring of hourly employees. She testified that she had not been given any instruc-

tions in hiring for jobs other than skilled craft jobs, such as machinist and maintenance man. Although she did not specifically recall hiring persons for a number of jobs she did recall hiring for the jobs of grinder, material handler, and machine operator in the Secondary and Decoration Departments. She testified that in making hiring decisions in those jobs she did not look for any particular kind of previous employment experience. She also stated that applications from both sexes were generally for any available job, not for particular job vacancies, a point which was fully corroborated by numerous witnesses at trial. She further stated that she never hired a woman as a material handler or offered a material handling job to a woman who then rejected it.

7. There is no evidence that most female applicants were aware of job alternatives within the plant or chose to be placed in the lesser paying machine operator jobs. In fact, the court finds from the testimony of numerous witnesses that most female applicants were usually unaware of job alternatives.

8. From the above facts, it reasonably appears and the court finds that women hirees at IMCO were, regularly and routinely, assigned to machine operator jobs on account of their sex, a practice which the court finds continued well beyond the date on which a charge of discrimination was filed with the E.E.O.C.

E. Class claims—promotions and transfers to non-supervisory positions

1. As of January 31, 1972, no female at IMCO had been allowed a transfer of jobs except between machine operator jobs in the Secondary and Decoration Departments, and the only promotions were to the jobs of quality control inspector, screen maker and ink blender, and lead and assistant lead ladies.[4]

2. The defendant has not raised and the evidence does not establish a bona fide occupational qualification defense on account of sex to any job in question.

3. The evidence indicates that some of the non-supervisory traditionally male job categories in question have skill requirements, from the simpler mechanical skills required of the utility man to the advanced skills required of the machinist and of the preventative maintenance man. On the other hand, there are no special skills prerequisite to the successful performance of the jobs of compounder, grinder and molder. In fact, it appears from the evidence that those positions are filled and successfully performed by persons without special job skills or experience who receive on-the-job training. According to the supervisor of both the Molding and the Grinding and Compounding Departments a majority of molders, compounders, and grinders have little if any previous experience, but are routinely provided with the necessary training. Like the jobs of compounder, grinder and molder the jobs of building maintenance, shipper and warehouseman require no special skills or experience, and as previously found, the same is true of the job of material handler.

4. As of January of 1974, there were substantially more females than males with from five to ten years of plant seniority. Likewise, there were substantially more females than males with ten years or more.[5]

5. The court finds, therefore, that the nearly total lack of female promotions to many of the higher paying traditionally male jobs through 1974 did not result from the absence of qualified females in defendant's work force.

6. The court finds that many of the female machine operators prefer the jobs to which they are assigned. The court finds, however, that there are and have been numerous females in machine operator jobs

---

4. The evidence indicates that of all males hired from 1959 through October of 1974, approximately 34.9% had job changes. During the same period of time, however, only 5.8% of all females had job changes.

5. See plaintiffs' exhibit 12, page 2.

that are or have been interested in the spectrum of traditionally male jobs at the plant.[6]

7. The defendant maintains that the lack of female job bids indicates a lack of interest in job promotions by females.[7] The court finds, however, that the following factors artificially limited female bids for promotions:

   a. *Sporadic job postings and word-of-mouth recruiting.*

     Plaintiffs maintain that most vacancies in traditionally male jobs were not posted. In support of this contention plaintiffs point to defendant's inability to produce postings to most vacancies in response to its discovery.[8] They also produced numerous witnesses who testified to the effect that such postings were infrequent. On the other hand, the production superintendent testified that he was instructed by the plant manager to begin posting for all positions and that pursuant to that instruction regular postings began sometime from mid to late 1970. He could not verify from personal knowledge, however, that all vacancies were in fact posted. For the most part, witnesses testified to seeing some postings but not others. It also appears that word-of-mouth recruiting, which was the main source of promotional recruitment prior to 1970, played an important roll in defendant's promotional recruitment through 1974. It reasonably appears from all the evidence, and the court finds, that job postings were sporadic at least through 1974, with male employees more likely to learn of job vacancies in traditionally male jobs.[9]

   b. *Failure to disclose job qualifications.*

     At least through 1974 job postings contained no job descriptions, failed to dis-

---

**6.** This conclusion is reached in part from an examination of defendant's exhibit 43 which shows female bids for vacancies in foreman-in-training, molder, utility, maintenance trainee, shipper and material handler job categories. It is also reached, in part, from the testimonies of the following witnesses relating their respective job interests: Edith Blose, Mary Breeden, Linda Bricker, Anna Davis, Nadine Dove, Eula Eppard, Agnes Heatwole, Naomi Higgs, Reva Holsinger, Janet Hoover, Delores Karr, Arvella Kohne, Nancy Lamb, Helen Mines, Peggy Minnick, Minnie Raynes, Phyllis Rinaca, Charlotte Stepp, Mary Stover, Rebecca Tuttle, Nora Van-Dedander, and Almeda Whetzel. No less significant, however, is the fact that former female operators, including at least six of the above-listed witnesses, are now employed in foreman-in-training, maintenance trainee, material handler, molder, shipper, and utility job categories.

**7.** In December of 1975, defendant delivered a questionnaire to each female employee in the Secondary and Decoration Departments inquiring as to why no bids were received for the utility and material handling jobs in the Secondary Department which had been posted in November and December of 1975, respectively. Defendant maintains that the responses to those questionnaires demonstrate a lack of interest by females in traditionally male jobs. While it can be determined from some of the responses that the person responding is uninterested in other jobs, the court finds many of those responses to be ambiguous. The jobs posted were for non-daylight work, and from most responses it cannot be determined whether the person responding is uninterested in the job category or is uninterested in the shift. Consequently, the court finds the responses to defendant's questionnaire to be probative of nothing more than that some females prefer their own jobs.

Defendant also contends that the paucity of responses to the court's "opt in" requirement in the notice of the pendency of the class action demonstrates that machine operators prefer the jobs to which they are assigned. The court finds that argument to be without merit as it is clear that prospective class members were not asked what jobs they preferred.

**8.** See plaintiffs' exhibit 19, pages 19–20.

**9.** The record is unclear as to which person actually determines who will get a particular job, although it is clear that the plant manager is ultimately responsible for all personnel decisions. Mr. Charles Howard, the plant manager, stated that such decisions are made by the production superintendent after consultation with the appropriate departmental supervisors. Deposition of Charles Howard, pages 14–15. Mr. Charles Fredrickson, the vice president of manufacturing and former plant manager, testified to the same effect. Deposition of Charles Fredrickson, page 103. However, Mr. Diehl, the production superintendent stated that the sum of his responsibility is to coordinate the personnel department with the supervisor of the department in which there is a vacancy. Deposition of Bobby Diehl, pages 5–6.

close job qualifications, and did not indicate that successful bidders would be trained.

c. *Discriminatory treatment.*

Certain females who were awarded promotions were treated discriminatorily. The following are two examples of such treatment. First, it is the usual practice at the plant to provide a new material handler during his first two weeks with the assistance of another material handler. Peggy Minnick, one of the named plaintiffs, tried out for the job of material handler in 1970 or 1971 but was not assisted, became discouraged, and returned to her job of machine operator. Second, Eula Eppard, also a named plaintiff, was awarded the job of material handler in the Decoration Department in 1972, was bumped in May of 1972 from the first shift to the third shift by a utility man with less plant seniority. She was later bumped from the Decoration Department to the Secondary Department while a less senior male material handler was left in the Decoration Department.

There is also evidence that the female seniority has not been honored in certain instances. Despite defendant's assertion that promotions are based on seniority, assuming qualifications are otherwise equal, and that in most instances seniority controls, Reva Holsinger, a named plaintiff to this action, bid in January of 1974, for the job of material handler. It was, nevertheless, awarded to a considerably less senior male bidder who has not been shown to have possessed greater qualifications for the job.

d. *Uncertainty concerning defendant's seniority system.*

Through the time of the trial there was considerable confusion among all employees at the plant, including supervisory personnel, concerning seniority policies for shift preferences, promotions, lay-offs, and recalls. This confusion was promoted by IMCO's failure to provide employees with a definitive written or oral statement explaining its policies, by the dissemination of incorrect information by supervisors on matters involving seniority, and by the inconsistent application of the seniority system when certain females were involved.

e. *Defendant's seniority system.*

Most employees prefer daylight shift work and defendant's seniority system (described in Part B, 5 of the court's findings of fact), which permits incumbent employees within a job category to bid for vacancies on other shifts based upon plant length of service, thereby leaving remaining vacancies open for plantwide bids, usually leaves less desirable shifts open for bidding. Consequently, the court finds that it perpetuates past acts of discrimination by its tendency to preserve the all male composition of the traditionally male job categories.

8. The court does not find IMCO's seniority system either to have been instituted to serve a discriminatory purpose or to have been maintained for such a purpose.

F. Class claims—promotions to foreman and foreman-in-training job categories

1. Through the time of the trial defendant had never promoted a female to the foreman or foreman-in-training job categories. While the lack of female promotions to those job categories is explained in certain departments by the historical absence of females in other jobs within those departments from which foremen or foremen-in-training would naturally be selected, it cannot be explained on that basis in the Secondary, Decoration, and Quality Control Departments which always have had considerably more females than males, including substantially more females with more than ten years of plant length of service.[10]

2. As of January of 1974, there were four foremen and two foremen-in-training

---

10. See plaintiffs' exhibit 12.

in the Secondary Department, three foremen and three foremen-in-training in the Decoration Department, and one foreman in the Quality Control Department. In the Secondary Department, from 1959 through October of 1974, there were five assignments to the job of foreman and nine assignments to the job of foreman-in-training. In the Decoration Department, from 1959 through October of 1974, there were four assignments to the job of foreman and 14 assignments to the job of foreman-in-training. Therefore, there was a total of 32 males and no females assigned to the foreman and foreman-in-training job categories in the Secondary and Decoration Departments from 1959 through October of 1974.

3. As of January 1, 1974, the average plant length of service of foreman in the Secondary Department was eleven years. As of that date there were 19 females in that department with more seniority. As of the same date in the Decoration Department, the average plant length of service of foreman was twelve years. There were 32 females in that department with more seniority than that average. The foreman of the Quality Control Department on January 1, 1974, had nine years of plant service. Of the other nine employees in that department, all females, seven had more seniority.

4. As its name implies, the lead lady job category in the Secondary and Decoration Departments is a female job which, as of the time of trial, had never been held by a male. While the job entails supervisory functions, it is subject to the supervision of the shift foreman who is paid at a substantially greater hourly rate.

5. Of the 16 lead and assistant lead ladies in the Secondary and Decoration Departments on January 1, 1974, all had nine or more years of plant service and six had fifteen years.[11]

6. From the above facts the court finds a significant number of females who have acquired experience and demonstrated skills qualifying them to be selected to foreman and foreman-in-training job categories.

11. See footnote 10.

12. See plaintiffs' exhibit 37 for example.

7. Defendant has given no adequate explanation of its policies regarding promotions to foreman and foreman-in-training job categories, and the court concludes that the absence of females in those jobs within the Secondary, Decoration, and Quality Control Departments is a product of defendant's preferential treatment of males.

G. Class claims—Rates of Pay

1. The plaintiffs have adduced no evidence that any female within any job category at the plant is or has been compensated at a rate of pay less than any male in that same job category with the same length of plant service; nor, have they adduced evidence that any female is or has been compensated at a rate of pay less than any male performing a job with the same or similar content.

2. The jobs of secondary machine operator, decoration machine operator (which includes relief operator work), and screen maker and ink blender, which plaintiffs maintain are "substantially underpaid in relation to the manner in which the defendant compensates its employees in its traditionally male jobs," unquestionably differ in primary content from all traditionally male jobs.[12]

3. An industrial engineer, Bertram Gottlieb, whom plaintiffs qualified as an expert, testified to the effect that the content of various female jobs justified greater pay when compared to the content of the various male jobs. He also opined, in part, that the content of the machine operator job is greater than the content of the material handler job. Robert Havemeyer, an industrial engineer, who was qualified by defendant as an expert, testified, in short, that the job contents of the jobs compared by plaintiff differ substantially and that the jobs require differing skills, effort, and responsibilities, and are performed under dissimilar working conditions.[13]

13. Mr. Gottlieb's conclusion was reached through the use of a job evaluation plan known as the National Metal Trades Association Job

**H. Class claims—Lunch break practices**

1. Until April of 1975, material handlers, utility men, compounders, molders, foremen and foremen-in-training in the Secondary, Decoration, Compounding, and Molding Departments were compensated for 20-minute lunch breaks. On the other hand, machine operators, lead ladies, and assistant lead ladies received 20-minute lunch breaks which were not compensated. Jobs in the Quality Control, Shipping; and Maintenance Departments had 30-minute uncompensated lunch breaks. The same is also true for grinders in the Grinding and Compounding Department.

2. In April of 1975, defendant ceased paying material handlers, utility men, foremen, and foremen-in-training for their lunch breaks, purportedly as a result of an economic slowdown. They now have 20-minute, uninterrupted lunch periods. Molders and compounders are still compensated for their lunch periods, however.

3. Plaintiffs allege that IMCO's lunch-break policy is based upon the sex of the "employees predominately filling the jobs" and not upon the duties of those jobs. They assert that equal treatment dictates that machine operators, lead ladies, and assistant lead ladies receive compensated lunch breaks.

4. Defendant maintains that its policy of paying for lunch breaks in certain jobs and not in others is based upon its interpretation of the Federal Wage and Hour Laws that it is required to pay for lunch breaks in those job categories which are not guaranteed routine uninterruptible lunch breaks. The regulations purportedly relied upon provide, in part, that "[a]n employee who is required to remain on call on an employer's premises or so close thereto that he cannot use the time effectively for his own pur-

poses, is working while on call," Title 29 C.F.R. § 786.17, and is not considered ". . . relieved if he is required to perform any duties, whether active or inactive, while eating." Title 29 C.F.R. § 785.19(a).

5. Plaintiffs do not contend that paying molders and compounders for their lunch breaks is discriminatory. Consequently, it was the company's pre-April 1975 practice of paying material handlers, utility men, foremen, and foremen-in-training, in the Secondary, Decoration, Compounding, and Molding Departments, but not machine operators and lead and assistant lead ladies, about which plaintiffs complain.

6.. The evidence indicates that as a result of company policy, utility men, material handlers, foremen, and foremen-in-training in the Secondary, Decoration, Molding, and Compounding Departments were on call during their lunch periods in that they were required to be available for work as needed. Machine operators and lead and assistant lead ladies, on the other hand, were not on call during their lunch periods and were free to leave company premises.

7. From the testimonies of several material handlers, the supervisors in the Secondary Department, and various machine operators, it appears that material handlers only infrequently interrupted their lunch periods, and this occurred primarily when the plant was busy or "at high volume." [14] Other evidence indicates that foremen, foremen-in-training, and utility men, like material handlers, were only infrequently required to interrupt their lunch periods.

8. From the testimonies of numerous machine operators and lead ladies, the court finds that lead ladies interrupted their lunch periods with the same approximate frequency as the foremen of their respec-

---

Evaluation Plan. Under that plan jobs are compared on the basis of eleven different factors. In evaluating the jobs in question, Mr. Gottlieb selectively modified the plan. Mr. Havemeyer used the same plan but without modification. Because the court finds the primary content of the jobs in question to differ, for reasons which are fully stated in the court's conclusions of law, the court finds it unneces-

sary to make a determination as to whether or not the jobs in question are "comparable" and appropriately compensated.

14. *See* Tr. Vol. III, 181 182, 208 -209, 285 286, 296; Tr. Vol. IV, 155 156, 161 162; Tr. Vol. VIII, 87; Deposition of Eugene McEnerney, 448 449.

tive departments. There is, however, no evidence that such interruptions were either required by their supervisors or pursuant to company policy.

9. The various job categories in the Maintenance Department and the jobs of quality control foreman, grinder, and shipper, were traditionally male jobs, yet they have never had compensated lunch periods. Consequently, while some traditionally male jobs had compensated lunch periods until April of 1975, others did not. The fact that some traditionally male positions had compensated lunch breaks, while the traditionally female job categories were not compensated for their lunch breaks, does not satisfy the court that defendant's lunch break practices were sex-based. In fact, the court finds the defendant's lunch break practices resulted from its attempt to conform to federal regulations and defendant's "on call" requirement for certain jobs was not a pretext for discrimination.

I. Class claims—Overtime opportunities

Plaintiffs have adduced evidence to the effect that males had substantially more hours of overtime work than females from 1972 to 1974. Plaintiffs have adduced no evidence, however, that females within particular job categories had less overtime hours than males in the same job categories or that they had substantially less overtime performing general chores. Likewise, there is no evidence that females applied for and were denied opportunities to perform overtime work at a greater rate than males.

J. Plaintiffs have not pursued their remaining class claims

K. Individual claims

Factual findings regarding individual job assignment, transfer, and promotional claims are reserved for the "back pay" stage of this trial.[15]

2. No individual has established either a rate of pay, lunch break, or overtime claim.[16]

3. Other claims of discrimination have not been pursued.

## CONCLUSIONS OF LAW

A. Class claims—Assignments to entry-level positions

Plaintiffs maintain that IMCO has traditionally considered machine operator jobs as female jobs and the higher paying material handler jobs as male and has made assignments accordingly. Section 703(a)(1) of the Civil Rights Act of 1964, as amended, Title 42 U.S.C. § 2000e–2, provides that it is an unlawful employment practice for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin . . . ." "In forbidding employers to discriminate against individuals because of their sex, congress intended to strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes. Section 703(a)(1) subjects to scrutiny and eliminates such irrational impediments to job opportunities and enjoyment which have plagued women in the past." *Sprogis v. United Airlines, Inc.,* 444 F.2d 1194, 1198 (7th Cir. 1971); *City of Los Angeles, Dept. of Water & Power v. Manhart,* 435 U.S. 702, 707, 98 S.Ct. 1370, 55 L.Ed.2d 657 n.13, (1978). It is, accordingly, an unlawful employment practice to classify a job as "male" or "female" unless sex is a bona fide occupational qualification for that job. Title 29 C.F.R. § 1604.3(a).[17] Defendant does not assert

---

**15.** As explained previously in that portion of the court's opinion dealing with its order of bifurcation, it has been determined that such claims are more appropriately dealt with at the "back pay" stage of trial.

**16.** As explained in the court's conclusions of law, however, individuals establishing entitle-

ment to back-pay recovery will be entitled to appropriate pay differentials, as proven, including overtime and any other proper element of back-pay recovery.

**17.** While not binding on the courts, interpretations of Title VII by the Equal Employment Opportunity Commission are entitled to "great

that any job assignment resulted from its application of a bona fide occupational qualification. Consequently, the questions presented are whether plaintiffs' evidence establishes a *prima facie* case of "disparate treatment" [18] in job assignments on account of sex and if it does whether defendant has proved that its job assignment decisions were based on legitimate considerations and not on the sex of the persons being assigned. Resolution of those questions must begin with consideration of the proper allocation of the burden of proof in the context of a class action.

In *McDonnell Douglas v. Green*, 411 U.S. 792, 800, 93 S.Ct. 1817, 1823, 36 L.Ed.2d 668 (1973), a case involving racial discrimination, the Supreme Court considered "the order and allocation of proof in a private, non-class action challenging employment discrimination." The court held that the plaintiff had the initial burden of establishing a *prima facie* case which it found was met when he demonstrated that he belonged to a racial minority, that he applied and was qualified for a job for which the employer was seeking applicants, that despite his qualifications he was rejected, and after his rejection the position remained open and the employer continued to seek applicants from persons of plaintiff's qualifications. 411 U.S., at 802, 93 S.Ct. 1817. A *prima facie* case having been established, the court found that the burden shifted "to the employer to articulate some legitimate nondiscriminatory reason for the employee's rejection." *Id.*, at 802, 93 S.Ct. at 1824. As

explained in *Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), "[t]he importance of *McDonnell Douglas* lies, not in its specification of the discreet elements of proof there required, but in its recognition of the general principle that any Title VII plaintiff must carry the initial burden of offering evidence adequate to create an inference that an employment decision was based on discriminatory criteria, illegal under the Act." 431 U.S., at 358, 97 S.Ct. at 1866. In *Franks v. Bowman Transportation Co.*, 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976) the Supreme Court applied the *McDonnell Douglas* principle in the context of a class action. In *Teamsters* the court explained the operation of the burden of proof in *Franks*:

The *Franks* plaintiffs proved, to the satisfaction of a District Court, that Bowman Transportation Co. "had engaged in a pattern of racial discrimination in various company policies, including the hiring, transfer, and discharge of employees." 424 U.S., at 751 [, 96 S.Ct. 1251]. Despite this showing the trial court denied seniority relief to certain members of the class of discriminatees because not every individual had shown that he was qualified for the job he sought and that a vacancy had been available. We held that the trial court had erred in placing this burden on the individual plaintiffs. By "demonstrating the existence of a discriminatory hiring pattern and practice"

---

deference." *Griggs v. Duke Power Co.*, 401 U.S. 424, 433 434, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 431, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); *Nance v. Union Carbide Corp.*, 540 F.2d 718, 728 (4th Cir. 1976).

18. In *Teamsters v. United States*, 431 U.S. 324, 335 336, n.15, 97 S.Ct. 1843, 1854, n.15, 52 L.Ed.2d 396 (1977), the court distinguished "disparate treatment" from "disparate impact":

"Disparate treatment" . . . is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin. Proof of discriminatory motive is critical, although it can in some situations be

inferred from the mere fact of difference in treatment. [Citations omitted.] Undoubtedly, disparate treatment was the most obvious evil congress had in mind when it enacted Title VII. . . .

Claims of disparate treatment may be distinguished from claims that stress "disparate impact." The latter involve employment practices that are facially neutral in their treatment of different groups, but that in fact fall more harshly on one group than another and cannot be justified by business necessity. [Citation omitted.] Proof of discriminatory motive, we have held, is not required under a disparate impact theory. [Citations omitted.] Either theory may, of course, be applied to a particular set of facts.

the plaintiffs had made out a prima facie case of discrimination against the individual class members; the burden therefore shifted to the employer "to prove that individuals who reapply were not in fact victims of previous hiring discrimination." *Id.*, at 772 [, 96 S.Ct. 1251]. The *Franks* case thus illustrates another means by which a Title VII plaintiff's initial burden of proof can be met. The class there alleged a broad-based policy of employment discrimination; upon proof of that allegation there were reasonable grounds to infer that individual hiring decisions were made in pursuit of the discriminatory policy and to require the employer to come forth with evidence dispelling that inference.

Consequently, in a class action, plaintiffs make out a *prima facie* case when they prove a discriminatory pattern and practice.[19] A "prima facie showing is not the equivalent of a factual finding of discrimination, however. Rather, it is simply proof of actions taken by the employer from which we infer discriminatory animus because experience has proved that in the absence of any other explanation it is more likely than not that those actions were bottomed on impermissible considerations"; an employer, therefore, must be permitted to come forward with " . . . evidence which bears on his motive." *Furnco Const. Corp. v. Waters*, 438 U.S. 567, 579–580, 98 S.Ct. 2943, 2951, 57 L.Ed.2d 957 (1978).

■ Having considered the proper manner of allocating the burden of proof, the court now turns to the question of whether the plaintiffs have met their burden of establishing a *prima facie* case by proving a discriminatory pattern or practice in initial job assignments. The answer to that question, of course, must come from an examination of statistical as well as non-statistical evidence. It is clear that Title VII does not require a work force to be balanced on the basis of race or sex. *Teamsters v. United-*

ed States, supra, 431 U.S. at 339–340, n.20, 97 S.Ct. 1843; *Lewis v. Tobacco Workers International Union*, 577 F.2d 1135, 1141 (4th Cir. 1978). In fact, § 703(j) of the Act, 42 U.S.C. § 2000e–2(j) provides, in relevant part, that the Act is not to be " . . . interpreted to require any employer . . . to grant preferential treatment to any individual or any group because of the race . . . . [or] sex . . . of such individual or group on account of an imbalance which may exist with respect to the total number or percentage of persons of any race . . . [or] sex employed by an employer . . . ." Nevertheless, the existence of an unbalanced work force may support an inference of purposeful discrimination. That is, "[s]tatistics can in appropriate cases establish a prima facie case of discrimination, without the necessity of showing specific instances of overt discrimination," *Barnett v. W. T. Grant Co.*, 518 F.2d 543, 549 (4th Cir. 1975), and "[w]here gross statistical disparities can be shown, they alone may in a proper case constitute prima facie proof of a pattern or practice of discrimination." *Hazelwood School District v. United States*, 433 U.S. 299, 307–308, 97 S.Ct. 2736, 2741, 53 L.Ed.2d 768 (1977). *See Teamsters v. United States, supra*, 431 U.S. at 339, 97 S.Ct. 1843. Courts have made it clear, however, that in analyzing statistics it is usually the qualified persons in the labor pool which must serve as a basis for comparison. *See Hill v. Western Electric Co., Inc.*, 596 F.2d 99 (4th Cir. 1979); *Equal Employment Opportunity Commission v. Chesapeake & Ohio Railway Co.*, 577 F.2d 229, 233 (4th Cir. 1978); *Roman v. ESB, Inc.*, 550 F.2d 1343, 1354–1355 (4th Cir. 1976).

■ In the present case, as the court has previously found (*see* Part D of the court's findings of fact), as of October of 1974 defendant had never initially assigned a female to the job of material handler al-

---

**19.** "The 'pattern or practice' language in § 707(a) of Title VII [citation omitted] was not intended as a term of art and the words reflect only their usual meaning." *Teamsters v. United States, supra*, at 336, n.16, 97 S.Ct. at 1855,

n.16. The same is also true when those terms are used in a private class action. *See Presseisen v. Swarthmore College*, 442 F.Supp. 593, 598 (E.D.Pa.1977).

though 214 males were initially assigned. On the other hand, during the same period of time, defendant initially assigned 688 persons to machine operator jobs, 684 females and only 4 males. If assignments are considered from August 6, 1971, the 180th day prior to the filing of charges with the Commission, through October of 1974, the figures are equally stark. During that period, 110 males and no females were initially assigned to material handling jobs, and of the 441 initial assignments to machine operator jobs, 437 were females and only 4 were males. The significance of these statistics is apparent when it is considered that neither job requires special qualifications. From these glaring disparities the court is entitled to infer, as it has done in its findings of fact, that the defendant has engaged in a pattern and practice of assigning females to the lesser paying machine operator jobs on account of their sex and that this practice continued beyond the time that charges were filed with the Commission. Defendant has attempted to rebut this *prima facie* showing by contending that assignments were made on the basis of individual preferences.[20] As the court's findings of fact make clear, however, this is simply not the case, as the usual job application was for any available position, with the applicant neither expressing a job preference nor being made aware of job alternatives. Accordingly, the court finds that the defendant has failed to rebut plaintiffs' *prima facie* showing of discriminatory treatment in initial job assignments.

**B. Class claims—Promotions and transfers to non-supervisory positions**

In *Griggs v. Duke Power Co.*, 401 U.S. 424, 430, 91 S.Ct. 849, 853, 28 L.Ed.2d 158, the Supreme Court held that under Title VII "practices, procedures or tests neutral on their face, and even neutral in terms of intent, cannot be maintained if they operate to 'freeze' the status quo of prior discriminatory employment practices." According to the court "Congress directed the thrust of the Act to the *consequences* of employment practices and not simply the motivation." *Id.*, at 432, 91 S.Ct. at 854. When policies or procedures are demonstrated to have discriminatory effects they must be justified by business necessity. *Id.*, at 431, 91 S.Ct. 849. The test for establishing business necessity is not merely whether there exists a business purpose for adhering to the challenged practice. Rather, "[t]he test is whether there exists an overriding legitimate business purpose such that the practice is necessary to the safe and efficient operation of the business." *Robinson v. Lorillard Corp.*, 444 F.2d 791, 798 (4th Cir. 1971); *U. S. v. Chesapeake & Ohio Railway Co.*, 471 F.2d 582, 588 (4th Cir. 1973). The Supreme Court has stated, however, that an employer "need not prove that he pursued the course which would both enable him to achieve his own business goal *and* allow him to consider the *most* employment applications. Title VII prohibits him from having as a goal a work force selected by any proscribed discriminatory practice, but it does not impose a duty to adopt a hiring procedure that maximizes hiring of minority employees." *Furnco Const. Co. v. Waters, supra*, 438 U.S. at 577–578, 98 S.Ct. at 2950.

Section 703(h) of the 1964 Civil Rights Act, 42 U.S.C. § 2000e–2(h) provides in part:

> Notwithstanding any of the provisions of this subchapter it shall not be an unlawful employment practice for an employer to apply different terms, conditions, or privileges of employment pursuant to a bona fide seniority or merit system, . . provided that such differences are not the result of an intention to discriminate because of sex . . . .

---

**20.** In addition to maintaining that assignments result from individuals choosing their jobs, defendant contends that the class members in fact prefer those jobs, relying in part upon responses to a questionnaire which it delivered to each female employee in the Secondary and Decoration Departments in December of 1975. The court has previously considered this evidence and found it to be probative only of the fact that *some* females prefer the jobs to which they are assigned. *See* footnote 7, *supra*.

In *Teamsters v. United States, supra,* 431
U.S. at 353–354, 97 S.Ct. at 1864, the Su-
preme Court held that "an otherwise neu-
tral, legitimate seniority system does not
become unlawful under Title VII simply
because it may perpetuate pre-Act discrimi-
nation." Consequently, 703(h) carves out
an exception to the holding of *Griggs* that
an otherwise neutral practice which perpet-
uates the effects of past discrimination is
violative of Title VII. This exception, how-
ever, has been narrowly construed by the
court of appeals for this circuit:

> As we read *Teamsters,* this is a narrow
> exception concerning only practices di-
> rectly linked to "a bona fide seniority
> system." Section 703(h) does not insulate
> an entire promotional system even if such
> system is facially neutral. At most, it
> insulates only the seniority aspects of the
> promotional system.

*Patterson v. American Tobacco Co., supra,*
at 303.

As with the case of "disparate treat-
ment,"[21] once a plaintiff has established the
disparate impact of a policy, practice, or
procedure, the burden of proof is shifted to
the employer. *Sledge v. J. P. Stevens &
Co., Inc.,* 585 F.2d 625, 636, n.19 (4th Cir.
1978).

In the present case, the statistics clearly
show a stratified work force with most fe-
males clustered in one job category, that of
machine operator. In fact, as the court has
previously found (see Part E of the court's
findings of fact), as of January 31, 1972,
just two days before the first charge of
discrimination was filed with the Commis-
sion, no female had ever transferred be-
tween jobs at the plant except between
machine operator jobs in the Secondary and
Decoration Departments, and the only pro-
motions were to the jobs of quality control
inspector, screen maker and ink blender,
and lead and assistant lead ladies. Further-
more, job categories at the plant remained
mostly segregated through January of 1974,
except for a small number of females
placed in material handling jobs and an
equally small number of males placed in

machine operator jobs. As stated by the
court in its findings of fact, some of the job
categories have skill requirements, from the
simpler mechanical skills required of the
utility man to the advanced skills required
of the machinists and of the preventative
maintenance man. Most of the jobs in
question, however, have no special skills
prerequisite to the successful performance
of the job, and there is no evidence that
defendant's female employees are less qual-
ified than its male employees. Moreover,
the evidence demonstrates that there are
significantly more females than males with
five or more years of plant seniority. These
facts point to a large pool of qualified fe-
males in the defendant's work force.

If the absence of females in most higher
paying job categories is the product of indi-
vidual preferences, then it would not consti-
tute a violation of Title VII. If, however, it
is a result of policies, practices, or proce-
dures not justified by business necessity,
then a violation of Title VII would be dem-
onstrated. In the words of the Supreme
Court in *Griggs v. Duke Power Co., supra,*
401 U.S. at 431, 91 S.Ct. at 853, what is
required by Title VII "is the removal of
artificial, arbitrary, and unnecessary barri-
ers to employment when the barriers oper-
ate invidiously to discriminate on the basis
of racial or other impermissible classifica-
tion." As previously related in the court's
findings of fact, however, many females
have, in fact, been interested in various
traditionally male jobs but failed to actively
pursue those jobs because of various dis-
criminatory practices.

In the court's findings of fact, at least
five factors were identified as being dis-
criminatory. First, job postings were spo-
radic through 1974 and word-of-mouth re-
cruiting played an important part in de-
fendant's promotional recruitment. As the
court of appeals has had the occasion to
note, word-of-mouth recruitment, in the ab-
sence of job postings, may be discriminatory
because of its tendency to perpetuate the
composition of a work force. *Brown v.*

21. *See* footnote 18, *supra.*

*Gaston County Dyeing Machine Co.,* 457 F.2d 1377, 1383 (4th Cir. 1972). *See generally, Barnett v. W. T. Grant Co., supra,* at 549; *Hairston v. McLean Trucking Co.,* 520 F.2d 226, 231 (4th Cir. 1975). Second, in those jobs which were posted through 1974, postings contained no job descriptions, failed to disclose job qualifications, and did not indicate that successful bidders would be trained. Females in a segregated job system who have traditionally occupied lower paying jobs would be unlikely applicants for traditionally male jobs with which they are not familiar and for which they are provided no job descriptions. As the court of appeals has recognized, discriminatory effects of past acts of discrimination may be perpetuated by the lack of definite job descriptions. *See Patterson v. American Tobacco Co.,* 535 F.2d 257, 271 (4th Cir. 1976), *modified on other grounds,* 586 F.2d 300 (1978). Third, plaintiffs were aware of discriminatory treatment. In the context of a segregated job system, discriminatory treatment of females who are awarded promotions will undoubtedly act to discourage other females who are potential applicants for promotion. It is unimportant that such treatment is not a product of defendant's desire to discourage other females from applying; it undoubtedly has that effect. Fourth, through the time of trial there was considerable confusion among all employees at the plant concerning the nature of defendant's seniority policies. As stated in the court's findings of fact, this confusion was promoted by IMCO's failure to provide employees with a definitive oral or written statement explaining its policies, by the dissemination of incorrect information by supervisors on matters involving seniority, and by the inconsistent application of the seniority system when certain females were involved. This uncertainty curtailed female bids. Last, that aspect of defendant's seniority system which permits incumbent employees within a job category to bid for vacancies on other shifts, thereby leaving the remaining vacancy open for plantwide bids usually leaves less desirable shifts open for bidding. Consequently, the court has found that it perpetuates past acts of dis-

crimination. Because, however, the court also has found the system neither to have been instituted nor maintained to serve a discriminatory purpose it falls within the ambit of § 703(h) of the 1964 Civil Rights Act, 42 U.S.C. § 2000e–2(h), and, therefore, does not violate Title VII. *Teamsters v. United States, supra.*

For the above-stated reasons the court finds that the plaintiffs have made a *prima facie* showing that defendant has engaged in practices having a "discriminatory impact" upon female promotions at the plant and that most of those practices continued well beyond the time that a charge of discrimination was filed with the Commission. The court also finds the plaintiffs' *prima facie* showing to be unrebutted.

C. Class claims—Promotions to foreman and foreman-in-training job categories

█ Plaintiffs' evidence regarding discrimination in promotions to foreman and foreman-in-training job categories reveals a total absence of females in those jobs through October of 1974. Although, as the court stated in its findings of fact, the lack of female promotions to those job categories is explained in certain departments by the historical absence of females in other jobs within those departments from which foremen and foremen-in-training would naturally be selected, it cannot be explained on that basis in the Secondary, Decoration, and Quality Control Departments, which have always had considerably more females than males including substantially more females with more than ten years of plant length of service. Keeping in mind that there must be an attempt to identify an available pool based upon experience or a combination of skill, experience, and job performance, or any other criteria which an employer might find relevant to decisions about promotions to supervisory positions, *Hill v. Western Electric Co., Inc.,* 596 F.2d 99 (4th Cir. 1979), the court is satisfied that the facts set forth in its findings of fact establish a reasonable basis for concluding that the absence of female foremen and foremen-in-training within the Secondary, Decoration, and Quality Control Depart-

ments is the product of defendant's preferential treatment of males. Stated differently, the court is satisfied that the evidence set forth in the factual findings establishes a *prima facie* case of disparate treatment and defendant has produced no evidence bearing on its motive which dispels that conclusion.

D.  Class claims—Rates of pay

█ Plaintiffs maintain that defendant has based its rates of pay in the various job categories upon the sex of the employees predominately assigned to those jobs and not job content. "[T]he plaintiffs' class is contending that its weaker position in the market has made it vulnerable to exploitation by the defendant" and that by taking advantage of this vulnerability the defendant has violated Title VII. (Plaintiffs' post-trial brief, at 22–23). While plaintiffs are not advancing a claim under the Equal Pay Act of 1963, 29 U.S.C. § 206(d)(1), they have attempted to establish their Title VII claim through the testimony of an expert who, in essence, aggregated factors of skill, effort, responsibility, and working conditions, in reaching an opinion that female job categories are undercompensated.

While Title VII does prohibit discrimination "against any individual in respect to his compensation . . .," Title 42 U.S.C. § 2000e–2(a)(1), it also provides, in relevant part, as follows:

> . . . it shall not be an unlawful employment practice under this Title for any employer to differentiate upon the basis of sex in determining the amount of the wages or compensation paid or to be paid to employees of such employer if such differentiation is authorized by the provisions of Section 6(d) of the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. § 206(d).

42 U.S.C. § 2000e–2(h). This portion of § 2000e–2(h) is commonly referred to as the Bennett Amendment. Its effect in a Title VII suit, when sex-based wage differentiation is claimed, is to shift the court's inquiry to that portion of the Fair Labor Standards Act known as the Equal Pay Act to determine the lawfulness of the wage differential.

To establish a case under the Equal Pay Act, employee plaintiffs have the burden of proving that their employer pays different wages to employees of the opposite sex for "equal work on jobs the performance of which requires equal skill, effort, and responsibility and which are performed under similar working conditions." Title 29 U.S.C. § 206(d)(1). *See Corning Glass Works v. Brennan*, 417 U.S. 188, 195, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974). While "overly nice distinctions in job content" should not lead to a finding of unequal work, *Brennan v. Prince William Hospital Corp.*, 503 F.2d 282 (4th Cir. 1974), congress clearly did not intend for the Act to be applied to work which is merely comparable. *Angelo v. Bacharach Instrument Co.*, 555 F.2d 1164 (3d Cir. 1977). Therefore, when jobs are evaluated under the Act the inquiry must focus upon the primary content of the jobs being considered:

> The Equal Pay Act comprehends a threshold requirement, evident in the legislative history and confirmed in the case law, that the *jobs* to be equated be substantially the same. The requirement of equality of job content inheres in the statutory term, "equal work."

*Angelo v. Bacharach Instrument Co., supra,* at 1173. For these reasons, the Act's requirements of equal skill, effort, responsibility, and similar working conditions cannot be aggregated to establish job equality.[22]

---

**22.** Plaintiffs' expert, Mr. Gottlieb, who, in essence, aggregated factors of skill, effort, responsibility, and working conditions in reaching an opinion that the female job categories in question are undercompensated, testified in a case under the Equal Pay Act in *Angelo v. Bacharach Instrument Co.*, 555 F.2d 1164 (3d Cir. 1977). In that case, Mr. Gottlieb also aggregated the pertinent factors, and the court found his testimony to be insufficient to meet the requirements of equal work as defined in the Equal Pay Act, and, in fact, found that the need to aggregate "tended to highlight the significant differences in the essential elements of the jobs he had examined." *Id.*, at 1173.

It is clear from the evidence (*see* Part G of the court's findings of fact) that the various jobs in question differ in primary content. Consequently, plaintiffs have not established a practice which is unlawful under the Equal Pay Act. For these reasons, the wage rates do not violate provisions of Title VII. Of course, sound policy underlies such a construction. Congress did not intend to put either the Secretary of Labor or the courts in the business of evaluating jobs and in determining what constitutes a proper differential for unequal work. *See Angelo v. Bacharach Instrument Co., supra; Brennan v. Prince William Hospital Corp., supra,* at 285. Sufficient remedies exist under Title VII to deal with discriminatory hiring and promotional practices, without the courts becoming embroiled in determinations of how an employer's work force ought to be paid. In *Wetzel v. Liberty Mutual Insurance Co.,* 449 F.Supp. 397 (W.D.Pa.1978), the court recognized the limited scope of remedial orders under Title VII when plaintiffs claim sex-based wage differentials which are not unlawful under the Equal Pay Act:

> An employer who violates Title VII by segregating job classifications by sex is not liable for the entire difference between the wages for the higher paid male jobs and the lower paid female jobs to each female who was thus denied a job opportunity unless the two jobs being compared were substantially equal in skill, effort and responsibility. [The] courts have held that only those women who can show that they have been denied their "rightful place" in a higher-paying position or a promotion will be entitled to this amount of damages.

*Id.,* at 400. Because of these considerations, that court held that in order to establish a case under Title VII it must be proved that a wage differential was based on sex and that there was the performance of equal work for unequal compensation. For these reasons, plaintiffs have failed to establish a claim.

E. Class claims—Lunch break practices

As previously found by the court (Part H, findings of fact), defendant's practice of compensating certain job categories and not others did not result from an intent to discriminate. Furthermore, while the practice did have an effect upon more females than males, the court is satisfied that the application of the rationale of *Griggs v. Duke Power Co., supra,* would be inappropriate for reasons similar to those stated by the court in rejecting plaintiffs' pay-rate claims. Courts are ill-equipped to determine what jobs permit employees to perform job functions and engage in personal activities in a manner which is consistent with the safe and efficient operation of the employer's business. If an employee has been discriminatorily assigned to a job category or denied a promotion, a back-pay remedy exists under Title VII, and in computing any back-pay award any difference in pay from the job to which he was assigned and the job from which he was excluded, would be taken into consideration. *Pettway v. American Cast Iron Pipe Co.,* 494 F.2d 211 (5th Cir. 1974), *rehearing denied,* 495 F.2d 1296. Consequently, the court rejects plaintiffs' claim based on defendant's lunch-break practices.

F. Class claims—Overtime opportunities

Plaintiffs have failed to establish a *prima facie* case of a discriminatory assignment of overtime work either under a theory of disparate impact or a theory of disparate treatment. Of course, any individual entitled to back-pay recovery would also be entitled to any demonstrated difference in pay, including overtime. *Pettway v. American Cast Iron Pipe Co., supra.*

G. Individual claims and class relief

Having found that defendant has discriminated against females in job assignments and promotions, the matter will be referred to a Special Master under Rule 53 of the Federal Rules of Civil Procedure for the computation of back pay, *see Hairston v. McLean Trucking Co., supra,* 520 F.2d at 233, and for such recommendations concerning remedial matters as may appear appropriate.

It is so ORDERED.